**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

W.D., on behalf of his minor children, A. & J.; J.J., on behalf of
her minor child, R.; L.V.G., on behalf of his four minor
children; P.J. and M.O., on behalf of his minor child, A., D. and
R.J., on behalf of their minor children, S. & O.; K.K., on behalf
of her minor children M. & G.;  L.K., on behalf of his minor
child, L.; M.K. on behalf of his minor child, A.; V.L., on behalf
of her two minor children; T. and M.M., on behalf of their minor
children Y., N. & S.; K.M., on behalf of her minor children, R.
& A.; J.O., on behalf of her minor child, T.; M.P., on behalf of
his minor children, Tr., and Te.; L.P., on behalf of her minor
child, M.; M.R., on behalf of her minor children R. & E.; J.R.,
on behalf of her minor child, C. and T.T., on behalf of his minor
child, M.; Y.T., on behalf of her minor child, Y.,

Docket No. 19-cv-02066
(JCM)

Plaintiffs,

-against-

ROCKLAND COUNTY, DR. PATRICIA SCHNABLE
RUPPERT, COMMISSIONER, ROCKLAND COUNTY
DEPARTMENT OF HEALTH, and ED DAY, COUNTY
EXECUTIVE, COUNTY OF ROCKLAND, both sued in their
individual and official capacities,

**PLAINTIFFS'**
**MEMORANDUM OF**
**LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION**
**FOR SUMMARY**
**JUDGMENT**

Defendants.

------------------------------------------------------------------------X

## STATEMENT OF FACTS

The material facts are set forth in Plaintiffs' Reply to Defendants' Statement of

Undisputed Material Facts and Counterstatement which is incorporated here and summarized as

follows.  Many of these facts are contained in the Amended Complaint and not disputed for the

purpose of this motion.

Plaintiffs sue defendants Rockland County, its County Executive and its Health

Commissioner for money damages arising from the exclusion of their healthy children from

school for four months during the 2018-19 school year.  Plaintiffs' children all attended the

1

Green Meadow Waldorf School and had received religious exemptions from vaccinations from that school. The school offers a unique pedagogy, and there is no similar school within a reasonable geographic distance from Chestnut Ridge where it is located.

During the 2018-19 school year, New York State provided for such religious exemptions for those with genuine and sincerely held religious beliefs. Each plaintiff qualified and his/her child attended school though unvaccinated. [1] The county health department played no role in determining which students obtained religious exemptions or in reviewing the extension of such exemptions.

In late September 2018, seven persons came to the United States from Israel. One had an active case of measles. The County Department of Health monitored this individual. Within ten days, another case of measles was reported. Additional cases arose in the Hasidic community located in New Square.

On October 18, 2018, defendant Ruppert advised certain schools within New Square to exclude unvaccinated children. Those schools had enrollees with measles. During the next six weeks, no child at GMWS contracted measles, and there was no case of measles reported in close geographic proximity to the school. Indeed, Ruppert admitted that there were no reported cases outside of the Hasidic communities in New Square, Monsey and Spring Valley.

Yet, on December 3, 2018, allegedly based on the low rate of immunizations at the school and a single unidentified nearby measles case, Ruppert ordered GMSW to exclude all unvaccinated students, regardless of their religious exemptions. [2] Defendant Ruppert so acted even though each excluded child had an exemption from immunization granted pursuant to state

---

[1] Contrary to defendants' claims, plaintiffs do not argue they were religiously exempt; they each had received religious exemptions for their children upon application as contemplated by state law.

[2] Contrary to defendants' claim, GMWS was the only "non-religious" school so directed.

law, there was no known or reported case of measles in the school or the broader Threefold community, and the referenced zip code encompassed a very large area, 11 square miles, and included insular populations with whom students at GMWS had and were likely to have no contact, and certainly no contact, while at school. GMWS abided by defendant Ruppert's order and excluded plaintiffs' children from school attendance. During the same month, Ruppert explicitly expressed her desire to see 100% of children vaccinated, overriding the state-created religious exemptions. Before this exclusion order, Ruppert provided plaintiffs with no notice that their religious exemptions were in jeopardy or any opportunity to be heard.

At the time of the exclusion, county health department employees advised GMWS staff that attainment of an 70% immunization rate would permit lifting of the exclusion order. This changed to 80% within a week and then 95% on December 21, 2018. No state law or regulation established 95% as an immunization rate that any school in New York needed to meet as a condition precedent to respecting religious exemptions. At the time, Ruppert knew that 50% of the students enrolled at GMWS had a religious exemption and that no case of measles had developed at the school. Likewise, the county health department advised GMWS that children could be returned to school 21 days after the last rash appeared within two zip codes and then altered this to 42 days after the last case anywhere in the county.

While defendant Ruppert imposed such exclusion orders on these healthy children, she and her staff did not use the tools and techniques contemplated by state law, namely quarantining people who had been diagnosed with, or exposed to, measles. While defendant Day claims that Ruppert told him that quarantines were "ineffective," defendant Ruppert denies making any such comments. She claims that she could not follow state regulatory guidance and direct quarantines of those infected or exposed because she lacked the staff to do so. But, she claims she first

3

realized she lacked the staff in April 2019, seven months after the first reported cases. Before then, she did not seek additional resources from any agency to implement a quarantine.

In late March 2019, heeding the requests of defendant Ruppert and at a time when the county had one or two active measles cases, defendant Day issued an emergency order quarantining all healthy, non-vaccinated students with religious exemptions for thirty days and disallowing them from attending, *inter alia*, school or religious assemblies. Executive Law section 24 authorizes local emergency orders for up to five days to deal with public emergencies like rioting, catastrophes or epidemics. The order disallowed plaintiffs' children [and others with religious exemptions but no others, including those with medical exemptions or unvaccinated persons over the age of 18] from public places for 30 days.

Defendant Day claims that he issued this order based on conversations with defendant Ruppert, heeding her request. Defendant Ruppert claims she had no direct involvement with this emergency order, was on vacation when it was issued, had not reviewed it and barely knew anything about it.

On April 5, 2019, State Supreme Court granted plaintiffs a TRO against this executive order, finding that plaintiffs had a substantial likelihood of showing that it was illegal, both in its duration and scope, and the prior school exclusion order imposed on GMWS by Ruppert, and allowed plaintiffs' children to return to their school. The county unsuccessfully sought to stay the TRO in the Second Department.

On April 16, 2019, without mentioning the stay, defendant Day rescinded the already enjoined emergency order and, with defendant Ruppert, announced an order quarantining those with measles and those contact tracing determined had been exposed to the contagious disease.

4

The quarantine order did not affect the school attendance of plaintiffs' children as they remained unexposed to the measles, either at home or in their schools.

In April 2019, Day and Ruppert traveled to Albany to lobby for the elimination of the religious exemption. Day attacked "anti-vaxxers" and claimed that there was no religious basis for the exemption and that those possessing it were involved in some form of fraud. Ruppert traveled and stood with Day, though she claims that she could remember no conversation with Day about "anti-vaxxers."

## SUMMARY OF LEGAL ARGMENT

At the time defendants acted, New York State recognized religious exemptions and each plaintiff had such an exemption and a state-created property interest. The force and effect of defendants' action was to override the religious exemption without any due process, though state law permitted this only where a case of a contagious disease was found in the school attended by a child with religious exemption. Likewise, defendants have not shown that there was a single case in "close" geographic proximity to the GMWS or that they acted with any statutory or regulatory authorization at all. Their actions wrongfully deprived plaintiffs' children of the right to attend school and parents of the right to make vaccination decisions [as they had done legally] for their children. Ruppert lacked authority for her actions, and Day's emergency order illegally exceeded his authority, as no emergency existed, and his order exceeded the duration of any order permitted under Executive Law section 24. The local emergency order disallowed children from attending their schools even where, as here, their schools did not have a single reported case of measles. This conflicts with both the state law allowing children with religious exemptions to attend school, Public Health Law section 2164(9) and 10 NYCRR section 69-3.10, and the regulation which allows children with such exemptions to be excluded from their schools

*only where* a case of measles has been reported in their specific school. NYCRR section 66-1-10. In the cases covered by Day's order, as well as prior County Health Commissioner exclusion orders, the County simply flaunted the state's legal edifice and punished those who are unvaccinated for religious reasons.

## **LEGAL ARGUMENT**

### I. **DEFENDANTS VIOLATED THE DUE PROCESS CLAUSE**

A. Plaintiffs had a state-created property interest

Defendants' analysis of the due process clause is confusing. First, property rights are created by state law. This applies to education. Goss v. Lopez, 419 U.S. 565, 573-74 (1975). There, appellants made arguments much like those made here: education is not a fundamental right, and suspensions without due process are permitted. The Supreme Court rejected these arguments in language equally applicable to this matter.

> At the outset, appellants contend that because there is no constitutional right to an education at public expense, the Due Process Clause does not protect against expulsions from the public school system. This position misconceives the nature of the issue and is refuted by prior decisions. The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law. Protected interests in property are normally "not created by the Constitution. Rather, they are created and their dimensions are defined" by an independent source such as state statutes or rules 573*573 entitling the citizen to certain benefits. *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972).

> Accordingly, a state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process. *Connell* v. *Higginbotham,* 403 U. S. 207 (1971); *Wieman* v. *Updegraff,* 344 U. S. 183, 191-192 (1952); *Arnett* v. *Kennedy,* 416 U. S. 134, 164 (POWELL, J., concurring), 171 (WHITE, J., concurring and dissenting) (1974). So may welfare qualifications. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970). *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), applied the limitations of the Due Process Clause to governmental decisions to revoke parole, although a parolee has no constitutional right to that status. In like vein was *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), where the procedural protections of the Due Process Clause were triggered by official cancellation of a prisoner's good-time

6

credits accumulated under state law, although those benefits were not mandated by the Constitution.

Here, on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education. Ohio Rev. Code Ann. §§ 3313.48 and 3313.64 (1972 and Supp. 1973) direct local authorities to provide a free education to all residents between five and 21 years of age, and a compulsory-attendance law requires attendance for a school year of not less than 32 weeks. Ohio Rev. Code Ann. § 3321.04 (1972). It is true that § 3313.66 of the Code permits school principals to suspend students for up to 10 days; but suspensions may not be imposed without any grounds whatsoever. All of the schools had their own rules specifying the 574*574 grounds for expulsion or suspension. Having chosen to extend the right to an education to people of appellees' class generally, Ohio may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred. *Arnett* v. *Kennedy, supra, at 164* (POWELL, J., concurring), 171 (WHITE, J., concurring and dissenting), 206 (MARSHALL, J., dissenting).

Although Ohio may not be constitutionally obligated to establish and maintain a public school system, it has nevertheless done so and has required its children to attend. Those young  people do not "shed their constitutional rights" at the schoolhouse door. *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 506 (1969). "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 637 (1943). The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.

The Due Process Clause also forbids arbitrary deprivations of liberty. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of the Clause must be satisfied. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437 (1971); *Board of Regents* v. *Roth, supra,* at 573. School authorities here suspended appellees from school for periods of up to 10 days 575*575 based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.[7] It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution.

In December 2018 and March 2019, indisputably, New York State recognized a property right to a religious exemption for those who applied and qualified. A student could attend either a private or public school despite his immunization status. Each plaintiff did apply and qualified for this exemption. That issue is not now in dispute. Rather than contest that plaintiffs had a state created property right which triggered due process, defendants argue that "the right to a religious exemption is not a fundamental right." But, that misunderstands the right in question. Whether New York was required to have a religious exemption is besides the point: it had one, and each plaintiff was covered by it.

Defendants' discussion of Jacobson v. Massachusetts, 197 U.S. 11 (1905) and Phillips v. City of New York, 775 F.,3d 538 (2d Cir. 2015) do not alter the due process analysis. In Jacobson, the Court upheld a local law which required mandatory vaccinations. We have no such instance here. New York had and has no such law. On the contrary, in 2018-19, New York provided for religious exemptions for which each plaintiff qualified. Rather, we have the misapplication of the state law by defendants who both failed to use the means and methods state law provided to control an outbreak of contagious disease and then upset, through the actions challenged herein, the careful balance the legislature had drawn between the rights of parents to religious exemptions and the need, in specified situations, to override them, specifically, when a case of a contagious disease appeared in an exempted child's school.

Likewise, defendants misread and misapply Phillips, supra., which is equally inapposite. There, the Second Circuit held that New York State did not violate the constitution when it applied the very regulatory scheme these defendants ignored. In Phillips, one plaintiff who had a religious exemption challenged her exclusion from school despite the presence of a case of a contagious disease in her school. The Court of Appeals ruled that the state had the right to so

regulate school attendance. A second plaintiff claimed that the State could not deny her a religious exemption after finding that she had no bona fide and sincerely held religious belief which warranted its grant. The Court of Appeals held that the State had the right to make such determinations in administering its religious exemption to vaccinations. Neither holding in any way undercuts plaintiffs' contentions here.

This court should reject defendants' recasting of <u>Phillips, supra.</u> to suggest that its holding in any way supports their *ultra vires* conduct. The "order of exclusion" sustained in <u>Phillips</u> was of the sort NOT imposed here. As the Court of Appeals noted at 540-41, "In November 2011 and January 2012, however, the Phillips and Mendoza-Vaca children were excluded from school when *a fellow student was diagnosed* with chicken pox, pursuant to a state regulation that provides, "in the event of an outbreak ... of a vaccine-preventable disease in a school, the commissioner, or his or her designee, ... may order the appropriate school officials to exclude from attendance" those students who have received exemptions from mandatory vaccination. 10 N.Y.C.R.R. § 661.10." [emphasis added]. No "fellow student" of any plaintiff was diagnosed with any communicable disease, making it inapplicable to our case 10 N.Y.C.R.R. sec. 661.10.

B. <u>No emergency condition existed in December or March</u>

In <u>Vialez v. NY City Housing Authority</u>, 783 F.Supp. 109, 113 (S.D.N.Y. 1991), this Court reiterated elementary principles: the touchstones of due process are notice and an opportunity to be heard. Here, there is no dispute that defendants eliminated plaintiffs' property interests without any notice and without any opportunity to be heard.

Where property rights are imperiled, pre-deprivation process is required unless there is a genuine emergency that requires urgent action or notice and an opportunity to be heard is

impracticable. DePietro v. City of New York, 09-CV-932, 2010 U.S. Dist. LEXIS 8598 at *6 (E.D.N.Y. 2010), Giglio v. Dunn, 732 F.2d 1133, 1135 (2d Cir. 1984). No emergency existed here which justified the absence of a pre-deprivation hearing. *Cf.*, Hodel v. Virginia Surface Mining Reclamation Ass'n., 452 U.S. 264 (1981), Catanzaro v. Weiden, 188 F.3d 56, 61-64 (2d Cir. 1999). No building was in danger of collapse and no mine was subject to calamitous failure. And, defendants have made no showing that notice and an opportunity to be heard could not have been given those affected.

Defendants submit that, because they faced a public health emergency and "swift action" was paramount, pre-deprivation due process was not practicable. Defendants claim that "[E]mergency situations may impact the ability of a health department to hold pre-deprivational hearings." *See* Defendants' Brief at 7. However, this assertion finds no factual support in the record, and a reasonable jury could easily disagree, and conclude not only that defendants acted in an *ultra vires* manner and that no "emergency" predicated the complained of actions. Indeed, defendants did not act until months after the "outbreak," and their actions were not dictated by any emergency.

Initially, as of December 3, 2018, defendants have made no showing that any emergency required expulsion of healthy children from a school that had no case of measles. GMWS was not geographically "close" to the communities which had a handful of active measles cases. It was in the same zip code, which was 11 square miles, and miles from the epicenter of a disease which spread through human contact and exposure. There had been no death or serious illness reported from any of the confirmed measles cases. And, as of December 2018, the county had not adopted the measure state law allowed, quarantining those with a contagious disease. Nor had the county health department requested additional staff to allow it to effectually quarantine,

assuming this posed any obstacle to use of that means of controlling spread. Whatever its current rhetoric, this strongly suggests that neither the State nor the County considered the situation emergent.

Further, as of March 26, 2019, a reasonable jury could conclude, there were a small handful of active measles cases in Hasidic neighborhoods, that GMWS had experienced no cases, and that the county had still not adopted quarantining of those with or exposed to measles. Indeed, remarkably, rather than quarantine those individuals,. Defendant Day sought to quarantine only healthy children who had religious exemptions. Absent use of that state-sanctioned means, a reasonable jury could view the defendants' action as motivated by their hostility toward the religious exemption rather than any actual public health measure.

The public comments by Day and Ruppert the next month confirm that hostility, denying the basis for religious exemptions and claiming that those seeking them were exploiting a loop hole in the system. Day publicly stated, "There's no such thing as a religious exemption." "The pushback is mostly from anti-vaxxers. They are loud, very vocal, also very ignorant." See Exhibit 16 to Sussman Declaration at 7-8. Defendant Ruppert claimed that doing away with the religious exemption is "exactly the action that needs to be taken." Id., page 8.

A reasonable jury could conclude that no public health emergency compelled the actions challenged here; rather, hostility toward the religious exemption did.

C. The availability of Article 78 does not save the failure to provide pre-deprivation process

If a pre-deprivation process is practical, it must be provided. The presence of an Article 78 proceeding does not save defendants from plaintiffs' due process challenge. The cases defendants cite t the contrary are inapposite. In Liotta v. Rent Guidelines Bd., 547 F.Supp. 800-811-12 (S.D.N.Y. 1982), Judge Connor dismissed landlords' claims that the rent guidelines

board denied them procedural due process when it adopted rent regulations at a raucous and threatening meeting. Judge Connor held that since the landlords were challenging a final administrative action taken pursuant to state law and regulations, an Article 78 proceeding provided appropriate relief. The landlords sought only injunctive relief, not damages. There was no issue of the feasibility of a pre-deprivation hearing raised in Liotta as the claimed due process violation derived from the continued conduct of the meeting under the described circumstances. Accordingly, the case offers no teaching relevant to this matter. Likewise, Alfaro Motors, Inc. v. Ward, 814 F.3d 883, 888 (2d Cir. 1987) is inapt. There, the Second Circuit reviewed complex state administrative and judicial proceedings by which appellant sought to reclaim certain taxi medallions which he had surrendered. The court held that plaintiff had litigated his issues in state court and could not use the federal court as a forum to re-litigate issues not decided to his liking in the state forum. In short, his due process rights were fully satisfied through the state court proceedings which he had initiated. Again, the Court of Appeals did not address the adequacy of pre-deprivation procedures, and this issue was not implicated in its decision.

Likewise, Giglio v. Dunn, 732 F.2d 1133 (2d Cir. 1984) bears no reasonable relationship to our facts: there, a teacher resigned from his job and then claimed that his school district violated his due process rights when it failed to provide him a pre-resignation hearing. The majority decision noted, " Due process requires only that a hearing be held at a meaningful time and in a meaningful manner. *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). **Where a pre-deprivation hearing is impractical** and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter. *Id.* at 541-42, 101 S.Ct. at 1916; *see Engblom v. Carey,* 677 F.2d 957, 964-66 (2d

Cir.1982)." Id. at 1135 [emphasis added]. Applying these principles, Giglio resigned making a pre-deprivation hearing impossible. The case has no bearing on the instant dispute.

In short, all the elements of a viable due process claim have been established, and defendants' motion to dismiss this claim should be denied.

## II.  PLAINTIFFS' FIRST AMENDMENT CASE IS SUPPORTED BY COMPETENT EVIDENCE and SUMMARY JUDGMENT SHOULD BE DENIED

The competent evidence against defendant Day suggests that he intentionally imposed a facially illegal executive order at a time when his county had a small number of measles cases without the input of the health commissioner and based on his own personal animus toward those holding religious exemptions to vaccinations. A reasonable jury may determine that he acted not only with profound and unconstitutional animus, but in a wholly irrational manner that demands accountability. As is demonstrated below, the defendants have failed to challenge the Second Cause of Action, arguing instead that the Commissioner's December 2018 order did not violate the First Amendment, a claim plaintiffs never advanced.

On March 26, 2019, Day issued a "Declaration of Local State of Emergency for Rockland County." His Declaration was aimed at, and only at, children who had religious exemptions to vaccination. See Exhibits 1 and 2. It sought to ban such children from any place of public assembly, including their schools, churches, malls and parks. By Decision and Order dated April 5, 2019, Supreme Court, Rockland County enjoined the force and effect of this Declaration, finding that no emergency existed in Rockland County so as to justify an Executive Order pursuant to Executive Law section 24. See Exhibit 7.[3]

Day stated without any factual basis, "The religious exemption has been abused and it has been used as a personal preference exemption."

---

[3] The County of Rockland sought emergency review and the Appellate Division for the Second Department affirmed the restraining order Judge Thorsen entered.

https://www.nydailynews.com/news/politics/ny-measles-exemption-bill-20190429-ldtsgxug4jhctbmczcsugupu2m-story.html, PIX News, June 14, 2019, 1:05. Day further remarked, "The truth is that the purported religious exemption for vaccinations as a requirement to enter public and private schools is a total myth and fabrication. In fact, it has become a "personal belief" exemption and that is NOT allowable under existing law." https://drive.google.com/file/d/1F74xfYygJWTj1kjT4ZZqEc3XsBzAx5pX/view, Day's Facebook post, May 10, 2019.

The First Amendment disallows state action which is motivated by disfavor toward religion and active hostility by government decision-makers toward the religious. The First Amendment to the United States Constitution recognizes a separation between church and state, the right of each person to engage in the free exercise of religion, and the right to not be compelled to engage in affirmative acts that violate religious beliefs absent a compelling state interest. The First Amendment requires states to demonstrate a compelling state interest to deny a religiously-based accommodation, to overrule religiously-compelled practices, or to force a person to act in a manner contrary to his/her personal religious beliefs.

An actual public health emergency may constitute a compelling state interest, allowing the state to override sincerely-held religious beliefs. However, our Court of Appeals has held that "history teaches that constitutional protections do not readily yield to blanket assertions of exigency." Ware v. Valley Stream High School Dist., 75 N.Y.2d 114,129 (1989).

Here, active hostility to religion motivated Day's promulgation of the emergency order. Moreover, no compelling state interest existed or was shown to exist to justify quarantining those children who had the religious exemption, thereby burdening plaintiffs' free exercise of their religious beliefs. This is particularly true since extant New York State law permitted the

14

exclusion of those with a religious exemption from school where an outbreak of a contagious disease occurred in their school, and this provision was never shown to be ineffectual or ineffective.

Finally, absent a compelling state interest, the executive order unconstitutionally compelled those of religious faith to either engage in acts prohibited by their faith, that is, vaccinate, or lose state-created rights, including that to a free public education for their children.

Plaintiffs challenge the executive order because it represents state action motivated by active hostility toward religion. As made actionable by 42 U.S.C. section 1983, the First Amendment to our Constitution bars such hostility. "The Constitution commits government itself to religious tolerance, and upon even the slightest suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember to their high duty to the Constitution and to the rights it secures." Masterpiece Cakeshop, LTD. v. Colo. Civil Rights Comm'n., 138 S.Ct. 1719, 1731 (2018).

In Masterpiece Cakeshop, at 1729, writing for a seven member majority, Justice Kennedy wrote:

> Whatever the confluence of speech and free exercise principles might be in some cases, the Colorado Civil Rights Commission's consideration of this case was inconsistent with the State's obligation of religious neutrality. The reason and motive for the baker's refusal were based on his sincere religious beliefs and convictions. The Court's precedents make clear that the baker, in his capacity as the owner of a business serving the public, might have his right to the free exercise of religion limited by generally applicable laws. Still, the delicate question of when the free exercise of his religion must yield to an otherwise valid exercise of state power needed to be determined in an adjudication *in which religious hostility on the part of the State itself would not be a factor in the balance the State sought to reach.* That requirement, however, was not met here. When the Colorado Civil Rights Commission considered this case, it did not do so with the religious neutrality that the Constitution requires.

Masterpiece Cakeshop, 138 S.Ct. at 1729 (emphasis added).

The proofs presented above strongly support the same conclusion. Active hostility toward religion punctuated the public comments of Mr. Day who claims that there was no basis for a religious exemption and publicly belittled those who held sincerely held religious beliefs, which had prompted them to obtain the available exemption. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 530 (1993) (striking municipal ordinance where hostility toward religious belief motivated its enactment).

Other undisputed facts support the conclusion that disdain for plaintiffs' sincerely-held religious beliefs, as opposed to any other factor, substantially motivated Day. First, to the extent there was an outbreak of measles in the State, it peaked in the months of November and December. During those months, Day was uninvolved in the issue. No emails suggest he played any role in shaping the county of Rockland's response. At deposition, he swore that early on, he told the Health Commissioner to come up with an "action plan." He could not recall ever seeing such an action plan. Dr. Ruppert denied he ever gave her that direction or that she ever developed any such action plan. There is no evidence that Day ever suggested that his Health Commissioner adopt a quarantine as contemplated by state law as the primary means of fighting the spread of a communicable disease. Instead, Day claims that Ruppert told him that quarantines were ineffectual. Ruppert denies every making any such statement to Day. She explains the county's failure to earlier adopt a quarantine of those with or exposed to measles on the ground that she lacked sufficient resources to implement such a quarantine. However, she also testified she did not realize she lacked these resources until April 2019 when the CDC told her this and helped rectify the shortage. The month before, however, Day imposed a quarantine on healthy children with religious exemptions, and the insufficient resources did not prevent this

16

course of action which, he claimed implemented Ruppert's suggestions. Ruppert denies this and claims she had nothing directly to do with the Day quarantine imposed on March 26, 2019 through his lawless executive order.

The panoply of contradictions would allow any reasonable jury to draw these conclusions: the county of Rockland, under Day and Ruppert, did not implement a quarantine of those with measles until mid-April 2016, well after the peak of the contagion. That quarantine was properly directed to those with the disease and those exposed to the disease. However, before that quarantine was mandated, defendants focused not on quarantining those with the disease, as state law contemplated, but on increasing to 95% school immunization rates so punishing those with religious exemptions like plaintiffs. GMWS had a 50% vaccination rate and no cases. Between December 2018 and April 2019, defendants excluded plaintiffs' children from school rather than quarantine those sick or exposed. At the same time, Ruppert and then Day lauded the objective of mandatory vaccination, though this was not the law in New York.

Second, in then advocating for elimination of the religious exemption, defendant Day repeatedly evinced hostility to those of religious faith. This anti-religious rancor was entirely unnecessary to a concern for public health. Day need not have attacked those with sincerely-held religious beliefs. Rather, he simply could have urged that those beliefs be subordinated to the alleged public health emergency. But Day did not have accurate data concerning that alleged emergency and, instead, repeatedly spewed vitriol at those with sincerely-held religious beliefs. As in Masterpiece Cakeshop and Lukumi, here, his order might be permissible if done for secular reasons, but not where influenced by hostility toward religion. Slockish v. United States FHA, 2018 U.S. Dis. LEXIS 174002 *5-6 (D.Or. 2018) (approving review of contemporaneous

statements by members of the decision-making body and the specific series of events leading to enactment by the legislature in adjudging the role of religion in the challenged act).

This attack on religion underlay his action and made it unconstitutional.

We next address Day's arguments which appears at pages 14-23 of defendants' Memorandum of Law.

First, contrary to the defendants' presentation, the enjoined executive order forbade those up to 18 years of age from being in any place of public assembly for thirty days. This included schools. Supreme Court of Rockland County enjoined both this executive order and that of Dr. Ruppert, which applied to GMWS students. Accordingly, children from the school returned to school of April 8, 2019. If, as defendants contend, the only order enjoined was Day's and it did not apply to schools, then how did the children return to school on April 8? Defendants seek to revise history. In effect, both Day's executive order and Ruppert's December order prohibited GMWS students from attending school.

Second, taking Day's testimony as plaintiffs are certainly entitled to do on this motion, his executive order was done at Ruppert's instance and intended to implement what she asked him to do. In this light, a reasonable jury could reject her effort to distance herself from the enjoined executive order. [4]

Third, the executive order is not "neutral" on its face; indeed, the only group it affects are those who had a religious exemption. The "prohibitions" section explicitly excepts children with medical exemptions from the directive, though these children are every bit as much likely to have carried undetected measles than a child with a religious exemption. In short, to call this approach "neutral" or one of "general applicability" is baseless. Indeed, the only people covered

---

[4] Defendants erroneously claim the order was issued on March 25 and revised on March 26, 2019; it was issued the 26th and revised on the 28th of March. See Exhibit 2 to Sussman Declaration.

by the law are those children under the age of 18 who had religious exemptions to vaccinations. Accordingly, under the precedent defendants themselves cite, the law must be justified by a compelling state interest and narrowly tailored to advance that interest. Matter of Church of Lukumi Babalu Aye, *supra*. at 531-32.

Definitionally, plaintiffs engaged in free exercise when they sought and obtained religiously-based exemptions to vaccination. This complied with state law. It did not represent a failure to comply with state law. As discussed above, the available evidence would support the conclusion that Day's illegal and enjoined order was intended to punish those exercising their religiously-derived right, as then provided by state law.

Even a cursory reading of the Amended Complaint demonstrates that plaintiffs' First Amendment argument relates not to the commissioner's order [the due process argument is addressed to that as well as to Day's late enjoined executive order], but, rather to Day's executive order. See Amended Complaint at paras. 82-86. Yet, defendants do not defend, in any manner, Day's Executive Order, but spend pages 16-22 of their memorandum of law defending the commissioner's December 2018 order against a claim plaintiffs do not advance.

And, in this defense, defendants themselves explain the infirmities of Day's later action which plaintiffs do challenge as violative of the First Amendment. For instance, at page 17 of their memorandum of law, defendants claim that the Commissioner's letter "does not distinguish between students based on the reason why they are unvaccinated or partially vaccinated." The same cannot be written about the challenged Day executive order. Defendants further defend the Commissioner's order, which is not challenged on this ground, claiming that it was issued "pursuant to extensive communications, risk assessments and approvals from, and in coordination with, New York State Department of Health." Id. To the extent this is intended to

defend the Commissioner's order, it also further condemns Day. He testified that he consulted with no one other than the Health Department and defendant Ruppert in formulating his Executive Order [she denied this], did not rely on his legal department, or have any contact with anyone from the State until a single call from someone on the Governor's staff after the order had been developed and fifteen minutes before the press conference where he released it. In short, the defendants' memorandum of law offers no defense to the First Amendment challenge to Day's action, and the court should bar any in reply papers. Summary judgment cannot be granted in this context on the second cause of action.

### C. **THE EQUAL PROTECTION CLAIM SHOULD BE SUSTAINED**

In their third cause of action, plaintiffs allege that Day's March 2019 Executive Orders "targeted those holding sincere religious beliefs while excluding from the reach of the same orders causing school exclusion those with medical reasons for not vaccinating their children and those unvaccinated persons over the age of 18, including those who had contact with persons who had contracted measles." See Amended Complaint, para. 83. Plaintiffs submit that no compelling state interest exists to quarantine healthy children with a religious exemption and not those children who had medical exemptions from vaccinations, those college students who had religious exemptions under Section 2165 of the Public Health Law, and the scores of adults who had no vaccinations.

Again, defendants defend the Commissioner's December 3, 2018 school exclusion letter though it is not the target of this cause of action.

Defendants do attempt to defend Day's March orders as against this cause of action starting at the bottom of page 25 of their brief. Day, the argument goes, understood that most of the measles cases affected children under 18 years of age. But, this does not explain why his

order only quarantined healthy children who had religious exemptions and excluded children with medical exemptions and those with or exposed to the measles. The former group of children were less fragile than the latter and it made no sense to exclude them from the order unless, as plaintiffs claim, Day's motive was to burden those with religious exemptions, the very kind of selectivity the case law defendants cite at pages 23-24 of their brief disallows. The argument that the medical exemption was intended to protect those who are fragile cannot explain why, in an outbreak, a rational quarantine order would not require this fragile group to stay indoors. Moreover, the public comments made by defendant Day the next month give plain evidence to his motivation: a reasonable jury could find that, contrary to then current New York State law, he abhorred the religious exemption and believed it represented a "hole" in the system which was being exploited by people who were not religious. This belittling attitude toward those of faith motivated Day and caused his order to allow all others to be free from quarantine, including those with or exposed to measles, while he irrationally focused on banning from public assembly, including schools, anyone who had a religious exemption.

Defendants claim that others were also banned from placed of public assembly by this order but are unable to identify what other classes of people to whom they refer.

Most critically for their argument, defendants suggest that Day forwarded public heath by an order which failed to include even those with and exposed to measles. The irrationality and bias evident in this approach are simply indefensible.

## IV. **DAY'S ORDER VIOLATED FREEDOM OF ASSEMBLY**

Finally, plaintiffs contend that the enjoined order restricted the right of those covered to assemble in violation of the First Amendment. Again, the Amended Complaint makes clear that

this cause of action relates to Day's challenged order, not the Commissioner's letter and derives from its express intent and operation.

No "clear or present danger of riot, disorder, interference with traffic upon the public streets or other immediate threat to public safety, peace or order" exists in this case, and defendants cannot claim that Day's enjoined and illegal order satisfies this standard.

Nor does Jacobson, supra. apply. Day's order bears no reasonable relationship to a legitimate public purpose, and a reasonable jury could conclude that rather than serving any public health objective, it was motivated by a desire to punish those who were using a state-created right for which they applied and qualified. Jacobson considered a law passed by a duly constituted legislature. On the contrary, Day's order was an overbroad emergency order, which flaunted the very statute upon which it was allegedly predicated. Indeed, a reasonable jury could find it nothing more than a cynical power play. Why, that jury might ask, did not Day issue a quarantine order instead to those very few with measles or exposed to measles? Why not keep them home as state law suggested was a responsible course? Why focus on those healthy children with religious exemptions? Did he, Day, have any data showing this group was spreading the disease? He did not, and none is cited.

Likewise, Day's reasonable restriction argument fails as his order was too narrow to meet this test, failing to include all those who were unvaccinated, men, women and children, and instead selecting a very small slice of that population. In short, no court could find this approach tailored to anything except Day's abhorrence of the religious exemption which cannot form the basis for a reasonable and neutral time, place or manner regulation.

### E. **PLAINTIFFS DID PLEAD DAMAGES BY DINT OF DEFENDANTS' CONDUCT**

Plaintiffs contend that the commissioner's violation of their due process rights and the

County executive's "emergency" order caused them significant damages, indeed, uprooting their lives for months without legal justification. This court agreed to defer damages discovery pending resolution of this motion.

Defendants now submit that these plaintiffs are somehow comparable to another group of plaintiffs who, following the repeal of the religious exemption, did not vaccinate and whose children were then excluded from school. In that context, the district court found the parents' own behavior causative of the deprivations suffered by their children. Of course, that case has no bearing here where the plaintiffs each held valid religious exemptions, which both the Commissioner and the County Executive ignored or abrogated without due process and, in the latter case, in plain derogation of the First and Fourteenth Amendments. Accordingly, the harm caused here was by and through defendants, not plaintiffs, <u>V.D. v. State of New York</u>, 403 F.Supp.3d 76 (E.D.N.Y. 2019) is inapposite, and this basis for summary judgment should be denied.

## **CONCLUSION**

Plaintiffs have introduced sufficient admissible evidence allowing a reasonable jury to sustain each of their causes of action. Defendants have pointed to no legal infirmity, and the facts taken most favorably to plaintiffs support their claims. Accordingly, the motion for summary judgment should be denied.

Respectfully submitted,

Michael H. Sussman [3497]

Sussman & Associates
PO Box 1005
Goshen, NY 10924
(845)-294-3991
Counsel for Plaintiffs

Dated; August 30, 2020