UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
W.D., on behalf of his minor children, A. & J.;
J. and E.E. on behalf of their minor children, A. & S.;
J.E. on behalf of his minor daughter, J.H.;
J.J., on behalf of her minor child, R.;
L.V.G., on behalf of his four minor children;
P.J. and M.O., on behalf of his minor child, A.;
D. and R.J., on behalf of their minor children,
S. & O.; K.K., on behalf of her minor children
M. & G.; L.K., on behalf of his minor child, L.;
M.K. on behalf of his minor child, A.; V.L., on
behalf of her two minor children; V.M. and A.M.
on behalf of their minor child, I.; T. and M.M.,
on behalf of their minor children, Y., N. & S.;
K.M., on behalf of her minor children, R. & A.;
J.O., on behalf of her minor child, T.; M.P.,
on behalf of his minor children, Tr. and Te.;
L.P., on behalf of her minor child, M.; M.R., on
behalf of her minor children, R. & E.; J.R., on
behalf of her minor child, C. and T.T., on behalf of his
minor child, M., Y.T., on behalf of her minor child, Y.,

               Plaintiffs,

       -against-

ROCKLAND COUNTY, DR. PATRICIA SCHNABLE
RUPPERT, COMMISSIONER, ROCKLAND COUNTY
DEPARTMENT OF HEALTH, and ED DAY, COUNTY
EXECUTIVE, COUNTY OF ROCKLAND, both sued in
their individual and official capacities.

             Defendants.
------------------------------------------------------------------X

**OPINION AND ORDER**

19 Civ. 2066 (JCM)

Plaintiffs[1] commenced this action[2] against the County of Rockland ("Rockland County" or "the County"), Rockland County Department of Health ("RCDOH"), Dr. Patricia Schnable Ruppert, Commissioner of Health of the Rockland County Health District ("Dr. Ruppert"), and Ed Day, Rockland County Executive ("Day") (collectively, "Defendants") on March 6, 2019. (Docket No. 1). Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 78, 79, 80, 81). For the reasons set forth below, Defendants' motion is granted.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed and taken from Defendants' Statement of Material Facts submitted pursuant to Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, ("Defs. 56.1"), (Docket No. 80), Plaintiffs' Response to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 and Counterstatement ("Pl. 56.1" or "Pl. Counterstatement"), (Docket No. 84),[3] the parties' exhibits,[4]

---

[1] On November 26, 2019, Plaintiffs J. & E.E. on behalf of their minor children, A. & S.; J.E. on behalf of his minor daughter, J.H.; and V.M. & A.M. on behalf of their minor child, I., voluntarily dismissed the action against all Defendants pursuant to Fed. R. Civ. P. 41(A)(1)(a)(ii). (Docket No. 51).

[2] This action is before the Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 40).

[3] Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and denied by only a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court deems such facts true. *See Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, 15-CV-03363 (NSR), 2018 WL 2416568, at *1, n.1 (S.D.N.Y. May 29, 2018); S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted . . ."); S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Plaintiffs' Response to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 and Counterstatement marks certain statements as "disputed," but does not identify any actual factual inconsistency. Where such counterstatements do not identify a true factual dispute, the Court treats the statement as undisputed. *See Martin v. Sprint United Mgmt. Co.*, 15 Civ. 5237 (PAE), 2017 WL 4326109, at *1 n.1 (S.D.N.Y. Sept. 27, 2017).

[4] Whereas the Court need only consider the cited materials, the Court may also rely on evidence in the record even if uncited. *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014); Fed. R. Civ. P. 56(c)(3).

and the briefs submitted by the parties in support of their contentions.[5]

## A. An Infected Traveler Brought Measles to Rockland County

At all times relevant to this action, Plaintiffs were adult residents of Rockland County whose children were enrolled in Green Meadow Waldorf School or the Otto Spect School (collectively, "GMWS"), private sister schools located in Chestnut Ridge, Rockland County. (Defs. 56.1 ¶ 1; Pl. 56.1 ¶ 1).

In or about late September 2018, an unvaccinated traveler from Israel exhibiting symptoms of measles arrived in Rockland County after landing in Newark, New Jersey. (Defs. 56.1 ¶¶ 8-9; Pl. 56.1 ¶¶ 8-9; Docket No. 79-9 at COR0000018).[6]  In the days and weeks that followed, RCDOH coordinated with the New York State Department of Health ("State DOH") to identify and test the traveler, as well as to implement contact tracing methods. (Defs. 56.1 ¶¶ 10-12).  RCDOH and State DOH also recommended self-isolation at home for anyone who became

---

[5] Defendants argue that Plaintiffs' citation to various newspaper articles and a Facebook post in support of their opposition is improper because these materials do not fit into any category of permissible evidence for consideration on summary judgment, and some of them are not attached as exhibits. (Docket No. 87 at 8-9).  Evidence considered at the summary judgment stage must be admissible at trial and grounded in "particular parts of materials *in the record*, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *See* Fed. R. Civ. P. 56(c) (emphasis added).  In addition, a court may not consider newspaper articles as evidence of the truth of the facts asserted therein, as newspaper articles are hearsay and would not be admissible for their truth at trial. *See Lawrence v. Cty. of Orange*, 09-CV-5043 (CS), 2012 WL 13208980, at *2 n.10 (S.D.N.Y. Sept. 20, 2012).  Nor may a court consider quotations from websites when the briefing is devoid of references to that information or supportive exhibits. *See Du Grenier v. Encompass Ins. Co.*, No. 2:16-cv-281, 2017 WL 9472173, at *5 (D. Vt. Dec. 28, 2017).  Therefore, the Court disregards the news articles attached to the Sussman Affidavit, *see* Docket No. 85-16, except for portions of the articles containing public comments by Day which Day adopted during his deposition. *See Rivera v. Inc. Vill. of Farmingdale*, 29 F. Supp. 3d 121, 130–31 (E.D.N.Y. 2013) (finding that quotation of defendant repeated in news article and adopted in deposition was admissible as a statement of a party-opponent); Fed. R. Evid. 801(d)(2)(B) & 805.  The Court also disregards quotations from websites in Plaintiffs' opposition that are not attached as exhibits nor accessible through the links provided. (Docket No. 83 at 13-14).

[6] References to page numbers beginning with the sequence "COR" refer to Bates stamp numbers on the pages of Docket Nos. 79-9, 79-10 and 79-11.  All other page number citations to the record refer to the ECF page number unless otherwise noted.

infected or who was exposed to the traveler and lacked immunity.[7] (Defs. 56.1 ¶¶ 13; 29).  The traveler was officially diagnosed with measles on October 1, 2018. (Pl. 56.1 ¶ 17; Docket No. 79-11 at COR0001102).

## B.  The Health Risks and History of Measles in the United States and New York[8]

Measles is a highly contagious viral disease that is spread through the air and prevalent in some developing countries, but typically rare in the United States since first licensure of a vaccine in 1963 and intensive efforts to vaccinate preschool-aged children in the 1990s. (Defs. 56.1 ¶ 5; Pl. 56.1 ¶ 5; Docket Nos. 79-14 ¶¶ 4-5; 79-3, Ex. A at 18-19; 85-12 ¶ 5).  Today, the measles vaccine is routinely recommended for all children over twelve months old in combination with the mumps and rubella vaccines ("MMR"), an attenuated version of the original vaccine. (Docket No. 79-3, Ex. A at 18-20).  Symptoms of measles include fever, cough,

---

[7] RCDOH, however, did not mandate a quarantine for infected individuals until April 12, 2019. (Pl. 56.1 ¶ 29; Pl. Counterstatement ¶ 54; Docket No. 85-15 at 2-6).  Dr. Ruppert testified that RCDOH lacked the appropriate staff to implement a quarantine until then, even though State DOH provided some assistance on "a limited basis." (Docket No. 79-7 at 57:18-58:11).  According to Dr. Ruppert, the mandatory quarantine was only made possible when the Center for Disease Control ("CDC") sent additional support, allowing her team to enforce the quarantine and actively monitor those who were infected or exposed to the disease. (Docket Nos. 79-7 at 57:6-59:12; 79-8 at 1:3-18).  Although Day did not mention such staffing or resource shortages as a reason why a quarantine was not mandated until April 2019, he testified that he was not directly involved in Dr. Ruppert and the rest of Defendants' efforts early in the outbreak because the "entire matter was being handled by the Health Department" since this was a health issue. (Docket No. 79-4 at 33:16-34:21).

[8] The Court takes judicial notice of certain historical and background information regarding measles. Fed. R. Evid. 201 permits the Court to take judicial notice of statistics and medical information from official government websites. *See United States v. Esquivel,* 88 F.3d 722, 726–27 (9th Cir.1996) (taking judicial notice of census data compiled by the United States Department of Commerce); *Basank v. Decker,* 449 F. Supp. 3d 205, 211 (S.D.N.Y. 2020) (taking judicial notice of background information regarding COVID-19 from CDC website); *Lin v. Metro. Life Ins. Co.,* No. 1:07-cv-03218-RJH, 2009 WL 806572, at *1 n.2 (S.D.N.Y. Mar. 30, 2009) (taking judicial notice of "certain medical background information" about Hepatitis B); *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.,* 630 F. Supp. 2d 255, 263 n.3 (E.D.N.Y. 2008) (taking judicial notice of International Trade Administration of the United States Department of Commerce website statistics to analyze the impact of SARS outbreak on plaintiff's business); Fed. R. Evid. 201.

The Court may utilize this information at this stage because "any facts subject to judicial notice may be properly considered in a motion for summary judgment." *Dark Storm Indus. LLC v. Cuomo,* 471 F. Supp. 3d 482, 490–91 & n.2 (N.D.N.Y. July 8, 2020) (quoting *Desclafani v. Pave-Mark Corp.,* No. 07 Civ. 4639(HPB), 2008 WL 3914881, at *5 n.7 (S.D.N.Y. Aug. 22, 2008)).

coryza and/or conjunctivitis, as well as a red rash that can last five to six days. (Docket Nos. 79-14 ¶ 6; 85-12 ¶ 5).  Measles may also cause blindness, pneumonia, croup, diarrhea and encephalitis, and in some cases, death. (Docket Nos. 85-12 ¶ 5; 79-14 ¶ 6).  Children under five years old and immunocompromised individuals are especially susceptible to complications. (Docket Nos. 79-14 ¶ 7; 85-12 ¶ 5; 85-13 ¶ 7).  The virus can also cause premature birth in pregnant women. (Docket No. 79-14 ¶ 7).  It is communicable four days before onset of the rash, or twenty-four hours before the onset of prodromal symptoms, through four days after the rash appears. (Docket No. 79-3, Ex. A at 16, Ex. D at 47).

As noted above, the incidence of measles in the United States is low compared to that in other countries. (Pl. 56.1 ¶ 5; Docket No. 79-3, Ex. A at 17-18).  The nation's drop in reported cases began in 1963 when the first vaccine was licensed. (Docket No. 79-3, Ex. A at 16-17). Between 1989 and 1991, however, states including New York experienced a resurgence, leading to 123 deaths nationwide. (*Id.* at 17).  For example, the Court takes judicial notice that in 1991, New York experienced a total of 2,306 reported cases.[9]  New York experienced another resurgence in 2013 and 2014, during which ninety-seven cases were reported.[10]  Between 2015 and 2017, the incidence of measles in the State dropped to seven or fewer cases per year.[11]

---

[9] NEW YORK STATE DEP'T OF HEALTH, COMMUNICABLE DISEASE IN NEW YORK CITY – REPORTED CASES OF SELECTED DISEASES BY DIAGNOSIS DATE: 1989-1999 (Nov. 2006), https://www.health.ny.gov/statistics/diseases/communicable/1999/nycdiag.htm; NEW YORK STATE DEP'T OF HEALTH, COMMUNICABLE DISEASE IN NEW YORK STATE EXCLUSIVE OF NEW YORK CITY – REPORTED CASES OF SELECTED DISEASES: 1989-1999 (Nov. 2006), https://www.health.ny.gov/statistics/diseases/communicable/2000/select.htm.

[10] NEW YORK STATE DEP'T OF HEALTH, REPORTED CASES OF SELECTED DISEASES: 2004-2013 (Oct. 2014), https://www.health.ny.gov/statistics/diseases/communicable/2013/new_york_state/by_year.htm; NEW YORK STATE DEP'T OF HEALTH, REPORTED CASES OF SELECTED DISEASES: 2004-2013 (July 2014), https://www.health.ny.gov/statistics/diseases/communicable/2013/new_york_city/by_year.htm; NEW YORK STATE DEP'T OF HEALTH, COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2014 (August 2015), https://www.health.ny.gov/statistics/diseases/communicable/2014/docs/cases.pdf.

[11] NEW YORK STATE DEP'T OF HEALTH, COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2017, https://www.health.ny.gov/statistics/diseases/communicable/2017/docs/cases.pdf; NEW YORK STATE DEP'T OF

To curtail the spread of measles, medical authorities recommend vaccination of non-immune individuals, post-exposure prophylaxis (*i.e.*, vaccination or administration of immunoglobulin to individuals exposed to the disease), and isolation of symptomatic individuals. (Docket No. 79-3, Ex. D at 44).  During outbreaks, these authorities also direct jurisdictions to consider exclusion of persons most susceptible to the disease from "outbreak settings," as well as postponement of gatherings such as social or religious events. (*Id.*).  However, vaccination is considered the key strategy in limiting the spread in such situations. (*Id.* at 49).  The CDC reports that for most individuals, the benefits of immunization are usually greater than the potential risks. (Docket No. 79-3, Ex. A at 26).  Allergic and other adverse reactions to the vaccine are uncommon and usually mild and of brief duration. (*Id.* at 27-29).  Moreover, although some parents have raised concern about a possible relation between the vaccine and autism, numerous studies have concluded that the available evidence does not support that theory. (*Id.* at 27-28).

**C.  The Incidence of Measles Increased and Rockland County Implemented School Exclusions**

By October 14, 2018, RCDOH had confirmed two cases of measles and identified a suspected case in an unvaccinated thirteen-year-old boy. (Docket No. 79-9 at COR0000127-128).  Upon RCDOH's request, due to staffing concerns, State DOH agreed to remain "directly involved in the outbreak management." (*Id.* at COR0000127).

On October 17, 2018, the State DOH Commissioner, Dr. Howard A. Zucker (the "Commissioner" or "Dr. Zucker"), authorized Dr. Ruppert to order schools in Rockland County with confirmed measles cases to take steps to protect their students from the virus pursuant to

HEALTH, COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2016 (Sept. 2017), https://www.health.ny.gov/statistics/diseases/communicable/2016/docs/cases.pdf; NEW YORK STATE DEP'T OF HEALTH, COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2015 (Sept. 2017), https://www.health.ny.gov/statistics/diseases/communicable/2015/docs/cases.pdf.

N.Y. COMP. CODES R. & REGS. tit. 66, § 1.10(a) (2018). (Defs. 56.1 ¶ 19; Pl. 56.1 ¶ 19). The next day, pursuant to instructions from State DOH, Dr. Ruppert ordered such schools to temporarily exclude from attendance any student who could not provide proof of vaccination, including those with religious or medical exemptions. (Defs. 56.1 ¶¶ 22, 24; Pl. 56.1 ¶¶ 22, 24). The orders required that the excluded students stay home until twenty-one days after the last "exposure" in the school. (Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25).

By the last week of October, the total number of cases in the County had risen to forty-five. NEW YORK STATE DEP'T OF HEALTH, NEW YORK STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch (select "ROCKLAND" from "County Dropdown;" then select "Click for a Data Table of Measles Activity"). Given the steady increase of cases, especially in children,[12] State DOH and RCDOH determined that to quell the spread of the virus, it was necessary to gradually broaden the exclusions to reach schools with no infected students, but with "low" vaccination rates and "in close geographic proximity" to certain areas with the highest concentration of confirmed cases. (Defs. 56.1 ¶¶ 30, 47; Pl. 56.1 ¶¶ 30, 47; Docket Nos. 79-6, 52:11–53:4; 79-7 at 27:12–29:13; 79-10 at COR0000672). Accordingly, on November 1, 2018, the Commissioner expanded Dr. Ruppert's authorization to enact broader exclusions in schools "in close geographic proximity to other schools with a confirmed case of measles," in addition to those in which there had been one or more confirmed cases, until December 31, 2018.[13] (Docket No. 79-3 at 34). To effectuate the broadened exclusions, State DOH used mapping technology to identify geographic concentrations of confirmed cases in two

---

[12] As of November 8, 2018, the median age of confirmed measles cases was eight years old and the mean age was 14.2 years old. (Defs. 56.1 ¶ 40; Pl. 56.1 ¶ 40; Docket No. 79-10 at COR0000721). This trend of higher incidence in children continued throughout the resurgence. (Defs. 56.1 ¶¶ 43, 54, 58; Pl. 56.1 ¶¶ 43, 54, 58).

[13] This authorization was renewed on December 26, 2018 and January 30, 2019. (Defs. 56.1 ¶ 19; Pl. 56.1 ¶ 19).

zip codes: 10977 and 10952, representing Spring Valley, Monsey and New Square. (Defs. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Docket Nos. 79-6, 69:7-70:17; 79-10 at COR0000730-32).  The two zip codes combined occupy approximately eleven square miles. (Docket No. 79-6 at 70:6-17).  The cases within these areas were predominantly in Hasidic Jewish communities. (Docket No. 79-6 at 34:15-17; 43:24-44:2; 57:20-58:14).

State and RCDOH initially defined a "low" vaccination rate as less than seventy percent, but on November 9, expanded the definition to include schools with vaccination rates under eighty percent. (Defs. 56.1 ¶¶ 31, 44; Docket No. 79-6 at 51:17-57:3).  Their ultimate goal was to reach schools with rates under ninety-five percent to achieve "herd immunity" within the County, which they collectively determined was necessary to prevent the spread of measles to those who cannot be vaccinated due to age, pregnancy and/or autoimmune conditions. (Defs. 56.1 ¶¶ 31-32; Docket Nos. 79-6, 51:17-57:3; 79-11 at COR0000816).

**D.  The County Ordered GMWS to Exclude Non-Vaccinated Students, Including Plaintiffs' Children**

On December 3, 2018, RCDOH ordered GMWS to exclude from school all non-vaccinated students for twenty-one days after issuance of the order, as GMWS was located in the same zip code as Spring Valley, 10977, and records from the 2016-2017 school year indicated that its vaccination rate was 33.2% (the "First Exclusion Order").[14, 15] (Defs. 56.1 ¶ 48; Docket No. 79-3, Ex. F at 62-63).  In the First Exclusion Order, RCDOH stated that the total number of cases in the County since the virus's initial resurgence had reached eighty-eight.[16] (Docket No.

---

[14] According to Plaintiffs, the vaccination rate as of that date was fifty percent, still well below the seventy or eighty percent threshold that had been set by RCDOH. (Docket No. 85-4 ¶ 7).

[15] Dr. Ruppert also testified that RCDOH had identified a measles case "quite near" GMWS but not on the school grounds. (Docket No. 79-6 at 75:15-76:10).

[16] Plaintiffs argue that Defendants' count of measles cases in the County as of various dates is misleading because it encapsulates the total number of cases reported, starting from the first diagnosis on October 1, 2018, even though the

-8-

79-11 at COR0000920-923).  The First Exclusion Order also provided that "additional exclusions . . . based on higher vaccination rates" may be necessary if cases continued to rise in the community. (*Id.* at COR0000921).  The Court takes judicial notice that over the prior three weeks, the virus's undisputed maximum incubation period,[17] there had been twenty-three new cases. NEW YORK STATE DEP'T OF HEALTH, NEW YORK STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch.  In the prior week, there had been four new cases. (*Id.*).

Whereas GMWS is not a religious school, GMWS's entire population of non-vaccinated elementary school students had religious exemptions, as did each of Plaintiffs' children. (Defs. 56.1 ¶ 49; Pl. Counterstatement ¶ 2).  Throughout the period of resurgence, GMWS had no measles cases. (Docket No. 85-4 ¶ 21).

**E.  Measles Cases Continued to Rise and the County Extended the Exclusions**

The Court takes judicial notice that as of December 21, 2018, a total of 105 cases had been reported within the County, with eleven over the prior three weeks and three in the prior week. NEW YORK STATE DEP'T OF HEALTH, NEW YORK STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch.  On the same day, RCDOH raised the

---

initially-reported cases had ceased to be "active" or contagious as of those dates. (Pl. 56.1 ¶¶ 41, 50).  Indeed, whereas the parties dispute the number of days during which an infected person can spread the disease, *see* Pl. 56.1 ¶ 41, even by Dr. Ruppert's logic, a person cannot be contagious for more than fourteen days, and typically manifests symptoms for about seven to ten days. (Docket No. 79-6 at 22:24-24:22).  This timeframe arguably renders obsolete a total count of cases months after the resurgence began, such as the assertion that there were eighty-eight cases as of December 3, 2018, because many of the individuals included in that count would no longer be symptomatic or contagious by that date. (Pl. 56.1 ¶ 50; Docket No. 79-6, 22:24-24:22).  The Court appreciates this distinction. However, because Plaintiffs ultimately do not dispute the accuracy of Defendants' counts as applied to the entire period of resurgence, the Court will consider these numbers as benchmarks of the increased incidence of the virus over time with the understanding that they do not represent the number of "active" cases on any particular date.

[17] According to Defendants, the disease is communicable for thirteen to fourteen days and the incubation period can last three weeks. (Docket No. 79-6 at 22:24-24:22).  Plaintiffs' experts opine that measles is "no longer communicable less than a week after symptoms appear" and that the incubation period is five to twenty-one days. (Docket Nos. 85-9 ¶ 5; 85-13 ¶ 4).

vaccination rate required by the exclusions from eighty to ninety-five percent, and informed GMWS that it would lift the exclusion in place if GMWS reached that threshold (the "Second Exclusion Order"). (Docket No. 85-4 ¶ 13, Ex. 5 at 24). RCDOH sent additional Exclusion Orders to other schools with vaccination rates under ninety-five percent on January 7, 2019. (Defs. 56.1 ¶ 52; Pl. 56.1 ¶ 52; Docket No. 79-11 at COR0000983-993). On January 30, 2019, after finding that the GMWS high school had achieved a ninety-five percent vaccination rate for students under eighteen, RCDOH lifted the high school's exclusion. (Docket No. 85-4 ¶¶ 16, 20).

On January 11, 2019, State DOH informed RCDOH that the total number of cases had risen to 116.[18] (Defs. 56.1 ¶ 54; Docket No. 79-11 at COR00001016). Plaintiffs contend that on February 7, 2019, RCDOH informed GMWS's nurse, Maureen Satriano, by phone that going forward, the exclusion would apply to GMWS's elementary schools as long as any active case of measles existed in the County, and that it would not be lifted until the schools achieved the ninety-five percent vaccination rate or forty-two days had passed without any new cases (the

---

[18] As previously explained, *see supra* n.16, Plaintiffs contest the relevance of this number because it includes the total number of cases that had been reported since the onset of the resurgence, rather than the number of "active" cases or individuals who were still contagious as of January 11, 2019. (Pl. 56.1 ¶¶ 41, 50, 54).

The Court also notes that there are some discrepancies between the case numbers that State DOH and RCDOH circulated internally, the back-up data in the record, and the case numbers throughout the resurgence listed on the State DOH website. For example, although Plaintiffs do not dispute that State DOH reported a total of 116 cases on January 11, 2019, Plaintiffs contend that a back-up graph circulated that day shows there were only fourteen new cases reported between December 1, 2018 and January 11, 2019. (*Id.* ¶ 54; *see also* Docket No. 79-11 at COR00001011). If this were correct, and it were also true that there were eighty-eight cases as of December 3, 2018 per the Order to GMWS, *see id.* at COR0000920-923, the total case count on January 11, 2019 would be only 102, not 116. Neither of these counts match the official tally of 128 reported cases as of January 12, 2019 on the State DOH website. NEW YORK STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch. These discrepancies are not sufficiently material to create an issue for trial, however, as the tallies presented in the record as well as on the website all indicate an increase in cases significantly above the numbers reported in the entire state in other years throughout the relevant period. (*See generally id.*; *compare* Docket No. 79-11 at COR0000920-923 *with* Defs. 56.1 ¶¶ 54, 57, 59; *see also* COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2017, https://www.health.ny.gov/statistics/diseases/communicable/2017/docs/cases.pdf; COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2016, https://www.health.ny.gov/statistics/diseases/communicable/2016/docs/cases.pdf; COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2015, https://www.health.ny.gov/statistics/diseases/communicable/2015/docs/cases.pdf).

"Third Exclusion Order").[19] (Docket No. 85-4 ¶ 23).  RCDOH told Ms. Satriano that it would contact her as new cases arose, but as of March 5, 2019, she had not received any updates. (Docket No. 85-4 ¶ 23). The Court takes judicial notice that as of February 7, 2019, a total of 140 cases had been reported in the County, with twelve cases in the prior three weeks and one in the prior week. N.Y. STATE DEP'T OF HEALTH, N.Y. STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch.

### F.  The March 2019 Emergency Declaration and Its Aftermath

On March 21, 2019, State DOH circulated graphs demonstrating a dramatic rise in cases during the first fifty days of the resurgence, followed by additional increases at the 100 and 150 day marks. (Defs. 56.1 ¶ 58; Docket No. 79-11 at COR0001095).  On March 25, 2019, State DOH reported that the County had seen a total of 152 measles cases, meaning that thirty-six new cases arose since January 11 according to State DOH's data. (Defs. 56.1 ¶ 59; Pl. 56.1 ¶ 59). The Court takes judicial notice that twenty-five cases had been reported in the prior three weeks with six in the prior week. NEW YORK STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch.

Given the continued increase in cases, albeit less severe than the initial surge in October and November 2018, Day issued a Local State of Emergency Declaration on March 26, 2019 (the "Emergency Declaration" or the "Declaration") barring unvaccinated children under the age of eighteen from places of public assembly, including schools.[20] (Defs. 56.1 ¶¶ 61-62; Pl. 56.1 ¶¶

---

[19] Plaintiffs allege that Defendants have repudiated the February 7 directive and never committed it to writing. (Pl. Counterstatement ¶ 70).  Plaintiffs do not cite to any evidence indicating any such repudiation, but Defendants' Rule 56.1 Statement does not mention this incident. (*Id.*; *see generally* Defs. 56.1).

[20] The Declaration forbade parents and guardians from allowing unvaccinated minors between six-months and eighteen years old "to enter any place of public assembly in Rockland County," unless such minor was unvaccinated due to serological immunity or a medical exemption. (Docket No. 85-1 at 2-3).  The Declaration defined "place of public assembly" to be "a place where more than 10 persons are intended to congregate for purposes such as civic,

61-62; Docket No. 79-13 at 3).  Whereas the Declaration did not apply to children exempt from vaccination for medical reasons, it did cover children with religious exemptions and children who were unvaccinated for any other reason. (Defs. 56.1 ¶ 62; Pl. 56.1 ¶ 62; Docket No. 79-13 at 3).  Day testified that he issued the Emergency Declaration based on the advice of Dr. Ruppert, who was concerned that due to the upcoming Easter and Passover holidays, cases would rise to the levels they reached in October 2018. (Docket No. 79-5 at 5:7-6:20).  However, Dr. Ruppert testified that she did not play a "direct role" in the development of the Emergency Declaration, nor did she review or specifically advocate for it. (Docket No. 79-6 at 81:3-82:3).

On April 4, 2019, in an Article 78 proceeding before the Supreme Court, County of Rockland, Plaintiffs sought a preliminary injunction ordering the County to rescind the Emergency Declaration and Third Exclusion Order, which was still in effect, so that their children could return to school. *See W.D. v. Cty. of Rockland*, No. 031783/2019 (Sup. Ct. Rockland Cnty. filed Apr. 3, 2019).  The Court granted the motion on April 5, 2019. *See id.*, 63 Misc.3d 932, 936-37 (Sup. Ct. Rockland Cnty. 2019).  On April 16, 2019, the Second Department affirmed the decision on appeal. *W.D. v. Cty. of Rockland*, No. 31784/2019 (2d Dep't Apr. 19, 2019), NYSCEF No. 45.[21]

Later that month, Day and Dr. Ruppert lobbied New York legislators to repeal religious exemptions to vaccination for diseases such as measles. (Pl. Counterstatement ¶¶ 136-37).  Day was quoted stating that such religious exemptions were "a hole in the system that's being abused," mostly by "anti-vaxxers" who were "loud, very vocal, also very ignorant." (*Id.* ¶¶ 138,

---

governmental, social, or religious functions, or for recreation or shopping, or for food or drink consumption, or awaiting transportation, or for daycare or educational purposes, or for medical treatment." (*Id.* at 3).

[21] Ultimately, the Supreme Court, County of Rockland dismissed the action as moot because the resurgence had ended, and the New York legislature repealed all religious exemptions to vaccination. *See id.*, No. 031783/2019 (Sup. Ct. Rockland Cnty. Aug. 21, 2019).

142; Docket No. 85-16 at 8).  Day also stated: "There's no such thing as a religious exemption. The bottom line here now is that in addition to the fear factor we have, we've had babies in ICUs.  We've had a baby born with measles . . . Let's do something that was done willingly years ago until people got in the middle, raised approaches and thoughts that were debunked years ago, and now to the direct detriment to the health of other people in the state.  It makes no sense.  We need this legislation passed . . . to wait is a recipe for medical disaster." (Docket No. 85-16 at 9-10).[22]

The New York legislature passed a bill repealing all religious exemptions for vaccination on June 13, 2019. S. Assemb. c. 35 § 1, 2019 S. Assemb., 242nd Sess. (N.Y. 2019).[23]

## G.  The End of the Resurgence

The County declared an end to the resurgence on September 25, 2019. (Defs. 56.1 ¶ 67). Over the course of the outbreak, the County issued temporary exclusion orders to approximately sixty schools, both secular and religious. (Defs. 56.1 ¶ 65).  Throughout that period, a total of 307 cases were reported within five miles of GMWS.[24] (Defs. 56.1 ¶ 66; Docket No. 79-6 at 19:16-21:17).

---

[22] Day adopted all of these statements in his deposition. (Docket No. 79-5 at 19:17-21:18; 30:7-31:11).

[23] The Court may take judicial notice of legislative and adjudicative facts encompassed by the public record, such as the repeal of a state law and publicly filed decisions of this and other courts. *See Abie State Bank v. Weaver*, 282 U.S. 765, 777 (1931);  *J.L. v. E. Suffolk Boces*, 113 F. Supp. 3d 634, 645 (E.D.N.Y. 2015).

[24] Plaintiffs vigorously dispute that Defendants have presented any evidence supporting the notion that there were measles cases "in close geographical [sic] proximity to the school" throughout the relevant period. (Pl. 56.1 ¶ 66). However, Defendants have provided numerous maps showing measles cases within zip code 10799 at various times, as well as a confidential case log listing 307 children by school name and age who were diagnosed with measles between October 1, 2018 and August 13, 2019 within five miles of GMWS. (Docket Nos. 79-3, ¶ 27, Ex. E at 60; 79-12 at 2).  To dispute this evidence, Plaintiffs cite to the affidavit of Dr. Tina Kimmel, a former Research Scientist for the California Department of Public Health, stating that "no evidence [was] presented to support this basis for exclusion," without further explanation or citations. (Pl. 56.1 ¶ 66; Docket No. 85-9, ¶¶ 1, 4).

The Court finds that absent any contention in Dr. Kimmel's affidavit that she reviewed the documents produced in this case, or has personal knowledge that Defendants' contentions are incorrect, this conclusory assertion does not constitute admissible evidence sufficient to create a triable issue of fact. *See Yu v. New York City Hous. Dev. Corp. (HDC)*, No. 07 Civ. 5541(GBD)(MHD), 2011 WL 2326892, at *2 (S.D.N.Y. Mar. 16, 2011), *report and*

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (citation and internal quotations omitted).  A fact is "material" if it might "affect the outcome of the suit under the governing law." *Id.*

In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation and internal quotations omitted).  However, the nonmovant cannot defeat a motion for summary judgment by relying on unsupported assertions, conjecture or surmise. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The nonmovant must also do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

---

*recommendation adopted sub nom. Yu v. New York City Hous. Dev. Corp.*, 2011 WL 2183181 (S.D.N.Y. June 3, 2011), *aff'd*, 494 F. App'x 122 (2d Cir. 2012) (holding that to the extent statements in affidavit submitted in opposition to summary judgment "are not based on [the affiant's] personal knowledge or potentially admissible attached exhibits, they are not admissible as evidence and [the Court] need not consider them"); *see also* Fed. R. Civ. P. 54(c)(4).  The Court therefore deems these facts admitted. *See Annunziata*, 2018 WL 2416568, at *1 n.1 ("[T]he Court considers those facts supported by admissible evidence for which Plaintiffs cite no evidence to the contrary, *undisputed* for the purposes of this motion") (emphasis in original).

*Corp.*, 475 U.S. 574, 586 (1986)).  To survive a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).

## III.  DISCUSSION

Defendants move for summary judgment on Plaintiffs' claims for violation of procedural due process (Count I), the Free Exercise Clause of the First Amendment (Count II), the Equal Protection Clause of the Fourteenth Amendment (Count III), and Plaintiffs' freedom of assembly rights under the First Amendment (Count IV), under 42 U.S.C. § 1983.[25]  They also argue that Plaintiffs are not entitled to damages resulting from any of these alleged violations because Plaintiffs caused their own harms by choosing not to vaccinate their children.

## A.  Procedural Due Process

Plaintiffs allege that Defendants' actions, including the Exclusion Orders and the Emergency Declaration, deprived Plaintiffs of their "state-create[d] right to send their children to school without vaccinations" without adequate process as required by the Due Process Clause of the Fourteenth Amendment. (Docket Nos. 35 ¶¶ 73-80; 83 at 6-8).

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.  The fundamental requirement of procedural due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  A determination of whether Plaintiffs

---

[25] Plaintiffs inconsistently allege that all named Defendants are liable for their first three causes of action, yet only Day and the County are responsible for their freedom of assembly claim, even though it arises out of the same conduct as the other claims. (Docket No. 35 ¶¶ 80, 82, 88).  Therefore, for purposes of this motion, the Court treats Plaintiffs' claims as applicable to all Defendants.

have a procedural due process claim is based on a two-part inquiry: first, whether they have asserted a property or liberty interest which is entitled to Fourteenth Amendment protection; and second, whether the procedures utilized by defendants when interfering with that interest meet constitutional requirements. *See Rivera v. Marcus,* 696 F.2d 1016, 1022 (2d Cir. 1982); *Bey v. City of New York*, No. 99 Civ. 3873 (LMM)(RLE), 2009 WL 2924429, at *15 (S.D.N.Y. Sept. 9, 2009), *aff'd sub nom. Kelly v. City of New York*, 576 F. App'x 22 (2d Cir. 2014).

The Court will address Plaintiffs' due process claim as applied to the Exclusion Orders and the Emergency Declaration separately.

## 1. Exclusion Orders

As explained below, the Court finds that Plaintiffs' procedural due process claim as applied to the Exclusion Orders fails as a matter of law for two reasons.  First, Plaintiffs have not asserted a property or liberty interest protected by the Fourteenth Amendment. *See Bey*, 2009 WL 2924429, at *15.  Second, Plaintiffs have not raised a genuine issue of material fact as to whether the process they received with regard to their children's exclusion from school was constitutionally inadequate. *See Kshel Realty Corp. v. City of New York*, 293 F. App'x 13, 15–16 (2d Cir. 2008) (summary order).

### i.  Plaintiffs Have Not Asserted a Protected Property Interest

Plaintiffs allege that their due process claim stems from a state-created "property right to a religious exemption for those who applied and qualified" under New York's Education Code and Public Health Code, N.Y. COMP. CODES R. & REGS. tit. 66, § 1.3(d) (repealed 2019), and N.Y. PUB. HEALTH LAW § 2164(9) (repealed 2019). (Docket No. 83 at 5-6, 8).  "Property interests are not generally constitutionally established; rather, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of

entitlement to those benefits.'" *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  Accordingly, to assert a

constitutionally-protected property interest, a plaintiff must establish that state law confers a

"legitimate claim of entitlement" to the alleged benefit. *See Roth*, 408 U.S. at 577.  This requires

a showing of "more than an 'abstract need or desire' for the matter at issue, or a 'unilateral

expectation' as to its receipt."[26]  *Ace Partners, LLC v. Town of E. Hartford*, 883 F.3d 190, 195

(2d Cir. 2018), *cert. denied sub nom. Ace Partners, LLC v. Town of E. Hartford, Conn.*, 139 S.

Ct. 122 (2018) (quoting *id.*).

   To determine whether a property interest arises from a state law, the Court examines the

law's plain language. *See generally Ace Partners*, 883 F.3d at 195–96.  On the one hand, "[a]

state-created entitlement that cannot properly be eliminated except for cause is a property right"

that cannot be infringed without procedural due process. *RR Vill. Ass'n, Inc. v. Denver Sewer

Corp.*, 826 F.2d 1197, 1201 (2d Cir. 1987).  However, if state law makes the pertinent official

action discretionary, a plaintiff's interest in a favorable decision does not rise to the level of a

property right entitled to constitutional protection. *See id.* at 1201–02; *Sullivan v. Town of Salem*,

805 F.2d 81, 84 (2d Cir. 1986); *cf. Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756

(2005) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462–63 (1989)).

   The Court therefore examines the plain language of the laws that Plaintiffs argue create

their alleged property interest. *See Ace Partners*, 883 F.3d at 195.  At the time Plaintiffs were

excluded from GMWS, N.Y. Public Health Law § 2164 mandated that all school children in the

---

[26] Defendants argue that Plaintiffs' procedural due process claim fails because "a religious exemption to
vaccinations is not a fundamental right." (Docket No. 81 at 17).  However, whether an alleged benefit is a
"fundamental right" is not the relevant inquiry to evaluate a procedural due process claim. *Cf. Reyes v. Cty. of
Suffolk*, 995 F. Supp. 2d 215, 228–230 (E.D.N.Y. 2014).  A plaintiff need only establish a "fundamental right" to
receive substantive due process protection, which Plaintiffs do not seek. *See id.*  Defendants' cases on this point are
therefore inapposite.

State be vaccinated for measles (and certain other diseases), except for those with medical exemptions and those whose parents or guardians held religious objections. N.Y. PUB. HEALTH LAW § 2164(2)(a), (8) (2019); *id.* § 2164(9) (repealed 2019).[27]  According to the statute's definition section, the word "school" included "any public, private or parochial child caring center, day nursery, day care agency, nursery school, kindergarten, elementary, intermediate or secondary school." *Id.* § 2164(1).  Similarly, N.Y. Comp. Codes R. & Regs. tit. 66, § 1.3 required that school children be vaccinated for the diseases listed in Section 2164 of the N.Y. Public Health Law, unless a student's parental relation provided the school a medical or religious exemption form. *Id.* § 66-1.3(c), (d).  Based on these exemptions, according to Plaintiffs, New York law conferred a benefit by guaranteeing their children the right to attend school despite not being vaccinated. (Docket No. 83 at 5-8).

> However, N.Y. Comp. Codes R. & Regs. tit. 66, § 1.10 provided, in relevant part:
>
> (a) For those diseases listed in PHL § 2164 only, *in the event of an outbreak of a vaccine-preventable disease in a school*, *the commissioner, or his or her designee*, . . . *may order the appropriate school officials to exclude from attendance all students who either have been exempted from immunization under section 66-1.3 (c) or (d) of this Subpart*, or are in the process of receiving required immunizations pursuant to section 66-1.3(b) of this Subpart.
>
> (b) The exclusion *shall continue* until the commissioner or his or her designee . . . determines that the danger of transmission has passed.

N.Y. COMP. CODES R. & REGS. tit. 66, § 1.10 (2018) (emphasis added).[28]  In other words, under New York law, in the event of an "outbreak" of disease, despite religious parents' rights under

---

[27] As previously noted, the religious exemption to N.Y. Pub. Health Law § 2164 and N.Y. Comp. Codes R. & Regs. tit. 66, § 1.3(d) was repealed after Plaintiffs initiated this lawsuit, on June 13, 2019. *See* S. Assemb. c. 35 § 1, 2019 S. Assemb., 242nd Sess. (N.Y. 2019).

[28] Plaintiffs argue that N.Y. Comp. Codes R. & Regs. tit. 66, § 1.10 is inapplicable because the permitted exclusion of unvaccinated students is only triggered when the "outbreak" takes place *within* such unvaccinated students' school. (Docket Nos. 35 ¶ 20; 83 at 9-10).  However, no such distinction appears in the regulation's language — it does not mention any requirement that unvaccinated children be excluded only where students at their own school are infected. *See generally* N.Y. COMP. CODES R. & REGS. tit. 66, § 1.10.  Indeed, the Court is bound by the plain

ordinary circumstances to send their children to school without being vaccinated, the

commissioner or his or her designee "*may*" order school officials to exclude such children,

"*until*" the commissioner, or his or her designee, "*determines*" it is safe for the children to return

to school. *See id.* (emphasis added).

The Court finds that the plain language of this subsection — especially the permissive

word "may" — affords the commissioner or his or her designee discretion to exclude "all"

unvaccinated students with religious exemptions from nurseries, daycares, preschools and

primary as well as secondary schools within his or her jurisdiction if an "outbreak" occurs.[29] *See*

*Citizens Accord, Inc. v. Town of Rochester*, No. 98-CV-0715, 2000 WL 504132, at *13

(N.D.N.Y. Apr. 18, 2000), *aff'd sub nom. Citizens Accord, Inc. v. Town of Rochester, New York*,

29 F. App'x 767 (2d Cir. 2002) (finding that the use of the permissive language, "may," in a

municipal law gave the Town Board "discretion" to bring an action to compel compliance with

the law).  Such discretion over official action extinguishes any constitutionally-protected

property interest. *See RR Vill. Ass'n*, 826 F.2d at 1201–02.  Accordingly, Plaintiffs' procedural

---

meaning of the laws and regulations governing Plaintiffs' alleged property interest and cannot "read" a limitation into the text that does not exist. *See Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 262 (2d Cir. 2006) (refusing "to read" a proposed "limitation into the regulation's text" that is not included in the "plain language of the regulation"); *Mapama Corp. v. New York City Dep't of Cultural Affairs*, 593 F. Supp. 296, 299 (S.D.N.Y. 1984) (applying plain language of laws and regulations governing coverage of a building under New York law).  Plaintiffs contend that that N.Y. Comp. Codes R. & Regs. tit. 66, § 2.6 mandates the limitation they ask the Court to impose, *see* Docket No. 35 ¶ 20, but that subsection is inapposite because it only applies to post-secondary students, and here, GMWS comprised of nurseries as well as primary and secondary schools. *See* N.Y. COMP. CODES R. & REGS. tit. 66, § 2 ("Immunization Against Measles, Mumps and Rubella for *Post Secondary Students*") (emphasis added); (Docket No. 85-4 ¶ 5).

[29] This comports with the broad powers New York and Rockland County afford local health officers and boards to control communicable diseases. *See* N.Y. PUB. HEALTH LAW § 2100 (empowering local health boards and officers to guard against communicable diseases by "the exercise of proper and vigilant medical inspection and control of all persons and things infected with or exposed to such diseases"); ROCKLAND COUNTY, N.Y., SANITARY CODE art. I, § 1.10.9 (2012) (allowing Rockland County Commissioner to make orders and regulations "concerning all . . . matters in his judgment detrimental to the public health"); *id.* § 1.11.1.7 (mandating that the Rockland County Commissioner enforce the provisions of the public health law, state sanitary code, and any local law); *id.* § 1.17.2 (permitting Commissioner or Commissioner's agents or employees to suppress potential dangers to public health on any premises).

due process claim fails as a matter of law if there was an "outbreak" at the time of the Exclusion

Orders, triggering the government's authority to exclude unvaccinated children until it

determined there was no longer any danger of transmission. *See id.*

Because the government's discretion under N.Y. Comp. Codes R. & Regs. tit. 66, § 1.10

hinges on whether there is an "outbreak," the Court next turns to the definition of "outbreak"

under that regulatory scheme. N.Y. Comp. Codes R. & Regs. tit. 10 defines "outbreak" as:

> [A]n increased incidence of disease *above its expected or baseline level*. As the
> number of cases which indicate the presence of an outbreak vary according to the
> infectious agent, size and type of population exposed, previous exposure or lack of
> exposure to the disease, and time and place of occurrence, the expected or baseline
> level of disease shall be assessed by hospitals and their infection control committees
> as directed in section 405.11 of this Title. *While an outbreak usually involves
> several cases of illness (e.g., food-borne poisoning, influenza)* [sic], *it may consist
> of just one case for certain rare and/or serious diseases (e.g., botulism, measles).*

*Id.* § 2.2(d) (2018)  (amended 2020) (emphasis added).

Although the last sentence states that an outbreak "may" occur for "just one case" of

"measles," the Court will examine whether the incidence of measles during the GMWS

exclusions in 2018 and 2019 was above its "expected or baseline level," as required by the first

sentence of the definition. *See id.*  As previously mentioned, incidence of measles in New York

and the United States dropped after a significant resurgence between 1989 and 1991. (Docket

No. 79-3, Ex. A at 16-17).  The highest number of cases reported in New York during this period

was 2,306 in 1991.[30]  By 1995, the number of cases had dropped to six in the entire state, with

zero in the County.[31]  After another resurgence in 2013 and 2014 amounting to ninety-seven

---

[30] Communicable Disease in New York City – Reported Cases of Selected Diseases by Diagnosis Date: 1989-1999, https://www.health.ny.gov/statistics/diseases/communicable/1999/nycdiag.htm; Communicable Disease in New York State Exclusive of New York City – Reported Cases of Selected Diseases: 1989-1999, https://www.health.ny.gov/statistics/diseases/communicable/2000/select.htm.

[31] N.Y. State Dep't of Health, Communicable Disease in New York State Reported Cases 1995, https://www.health.ny.gov/statistics/diseases/communicable/1995/docs/cases95.pdf.

cases in the State, the numbers dropped again.[32]  There were seven cases in the State and zero in

the County in 2015, one case in the State and zero in the County in 2016, and four cases in the

State and zero in the County in 2017.[33]  Therefore, the Court finds that for purposes of

determining whether an "outbreak" occurred, the "baseline" incidence of measles for the State of

New York is seven or fewer cases over the course of one year. *See* N.Y. COMP. CODES R. &

REGS. tit. 66, § 1.10; tit. 10 § 2.2(d).

In comparison, as of the First Exclusion Order, RCDOH had counted eighty-eight cases

within the County since October 1, 2018. (Docket No. 79-11 at COR0000920-923).  By

December 21, 2018, when RCDOH raised GMWS's required vaccination rate from eighty to

ninety-five percent, there had been a total of 105 reported cases within the County since October

1, 2018. N.Y. STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch;

Docket No. 85-4 ¶ 13.  Moreover, as of February 7, 2019 — when Plaintiffs claim they were told

that the order would apply to GMWS's elementary schools as long as any active case of measles

existed in the County — there had been a total of 140 cases. N.Y. STATE MEASLES WATCH,

https://nyshc.health.ny.gov/web/nyapd/measles-watch; (Docket No. 85-4 ¶ 23).

The Court finds that the incidence of the disease on each exclusion date was well-above

the "baseline level" of cases during the years following both the 1989-1991 and 2013-2014

---

[32] COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2014,
https://www.health.ny.gov/statistics/diseases/communicable/2014/docs/cases.pdf; REPORTED CASES OF SELECTED
DISEASES: 2004-2013,
https://www.health.ny.gov/statistics/diseases/communicable/2013/new_york_state/by_year.htm; REPORTED CASES
OF SELECTED DISEASES: 2004-2013,
https://www.health.ny.gov/statistics/diseases/communicable/2013/new_york_city/by_year.htm.

[33] COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2017,
https://www.health.ny.gov/statistics/diseases/communicable/2017/docs/cases.pdf; COMMUNICABLE DISEASE IN NEW
YORK STATE CASES REPORTED IN 2016,
https://www.health.ny.gov/statistics/diseases/communicable/2016/docs/cases.pdf; COMMUNICABLE DISEASE IN NEW
YORK STATE CASES REPORTED IN 2015,
https://www.health.ny.gov/statistics/diseases/communicable/2015/docs/cases.pdf.

resurgences — which consistently amounted to zero cases in the County, and as stated above, seven or fewer cases throughout the State. *See* N.Y. COMP. CODES R. & REGS. tit. 10, § 2.2. Although Plaintiffs are correct that the number of newly-reported cases on each of these dates was far lower than the total amount of cases Defendants reported since the resurgence began, (Pl. 56.1 ¶¶ 41, 50, 54), that does not change the analysis because the number of newly-reported cases on each date still indicates an infection rate well above the baseline for the entire State. *See* N.Y. COMP. CODES R. & REGS. tit. 10, § 2.2.  For example, the Court takes judicial notice that in Rockland County alone, as of December 1, 2018, twenty-three cases were reported in the prior three weeks, and four cases were reported in the prior week. N.Y. STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch.  As of December 21, eleven new cases had been reported within the prior three weeks, with three in the prior week, and as of February 7, 2019, there had been twelve new cases in the prior three weeks, with one in the prior week. *Id.* Even accepting as true Plaintiffs' allegation that the incubation period is five to twenty-one days long, the recorded incidence of new cases in the County over this timeframe leading up to each of the Exclusion Orders indicates an infection rate well above the "baseline level" of seven or fewer cases in the *entire* State of New York over the course of a *single* year. *See* N.Y. COMP. CODES R. & REGS. tit. 10, § 2.2.

The Court finds that there was an "outbreak" of measles when RCDOH instituted each of its Exclusion Orders because both the cumulative counts and numbers of new cases as of the dates of the orders were all above the "baseline level" in either the State or the County. *See id.* Consequently, on each of these dates, the commissioner, or his or her designee, had discretionary authority to order school officials to exclude from attendance children exempted from vaccination for religious reasons, until he or she "determine[d]" it safe for those children to

return to school. *See id.* tit. § 1.10.  Such discretion defeats Plaintiffs' argument that they had a property interest in sending their children to school without vaccination, because they lacked a "legitimate claim" to that right at the time the orders were issued. *See Roth*, 408 U.S. at 578; *Sullivan*, 805 F.2d at 84.  Absent such an interest, Plaintiffs' procedural due process claim fails. *See Bey*, 2009 WL 2924429, at *15 (granting summary judgment on procedural due process claim where entitlements under New York law did not include the alleged property right); *Police Benevolent Ass'n of The N.Y. State Troopers, Inc. v. Bennett*, 477 F. Supp. 2d 534, 544–45 (N.D.N.Y. 2007) (dismissing procedural due process claim where objected-to executive order gave Superintendent of State Police discretion to select which retirement-age members would be retained).

Plaintiffs argue that *Goss v. Lopez*, 419 U.S. 565 (1975), establishes a "property right" to "education," (*see* Docket No. 83 at 24), but that case is distinguishable because it involves an entirely different state statutory regime and educational context.  There, students who had been suspended from public high schools in Columbus, Ohio without hearings sued the Columbus Board of Education, alleging that their suspensions violated the Due Process Clause. *See id.* at 568–69.  The Court held that the plain language of Ohio law, Ohio Rev. Code Ann. § 3313.64 (1972), conferred the plaintiffs "legitimate entitlement" to a public education, because it provided free education to all children between the ages of six and twenty-one. *See id.* at 574. This meant that the State could not "withdraw that right on grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct ha[d] occurred." *See id.*

However, property rights are created by state law, so it is New York's laws, not Ohio's laws, that the Court must examine to determine whether Plaintiffs' alleged right is constitutionally-protected. *See Roth*, 408 U.S. at 577.  Nor is the alleged infringement here of

Plaintiffs' rights to religious exemptions comparable to suspension without due process. (Docket No. 83 at 5, 8).  For that reason, New York's Public Health Law and regulations regarding religious exemptions are the relevant statutory and regulatory frameworks here. *See Roth*, 408 U.S. at 577.  *Goss* therefore does not control.

### ii.  The Process Plaintiffs Received Was Adequate

Even assuming that Plaintiffs had a constitutionally-protected property interest, the Court also finds that Plaintiffs have failed to raise a triable issue of fact as to whether the process they received via their Article 78 proceeding before the Supreme Court, County of Rockland, was inadequate. *See Parratt v. Taylor*, 451 U.S. 527, 538–39 (1981); *Jaramillo*, 536 F.3d at 145.

To determine whether the State's procedures were constitutionally sufficient, the Court employs a balancing test considering: (1) the private interest at stake; (2) the risk of erroneous deprivation through the procedures used and the probable value of additional procedures; and (3) the government's interest. *See Mathews*, 424 U.S. at 334–35.  Generally, a pre-deprivation hearing is required when property is deprived pursuant to a state procedure and "'process' could be offered before any actual deprivation took place.'" *See Parratt*, 451 U.S. at 537–38. However, the Supreme Court has held that in some circumstances, procedural due process can be satisfied by a "meaningful" post-deprivation remedy when "quick action by the State" is necessary, or when "any meaningful predeprivation process" would be "impracticab[le]," including in an emergency. *See id.* at 539–41; *see also Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300–01 (1981).  This is because "[r]equiring an official to seek a judicial determination prior to invoking an emergency procedure intended to address urgent situations contradicts the very reason the emergency procedure exists." *See Kshel*, 293 F. App'x at 16.

The Supreme Court has defined an emergency as a "situation[] in which swift [governmental] action is necessary to protect the public health and safety." *See Hodel*, 452 U.S. at 301.  In such situations, "due process is violated 'only when an emergency procedure is invoked in an abusive and arbitrary manner.'" *Reynolds v. Krebs*, 336 F. App'x 27, 29 (2d Cir. 2009) (quoting *Catanzaro v. Weiden*, 188 F.3d 56, 62 (2d Cir. 1999)) (hereinafter "*Reynolds II*") (summary order).  The existence of an emergency at the time of the alleged deprivation is an issue of material fact that must be decided before inquiring into the adequacy of the post-deprivation remedy. *See Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir. 1983).  The Court must determine whether: (1) Defendants' emergency action invoking the Exclusion Orders was exercised in an arbitrary manner; and (2) a meaningful post-deprivation remedy was available to Plaintiffs. *See id.*

**(a) Reasonableness of Emergency Procedures**

With regard to the existence of an emergency, courts must afford the decision to invoke emergency procedures "some deference," and avoid "engag[ing] in a hindsight analysis" of whether there was actually an "immediate danger to the public" at the time of the State's action. *Catanzaro*, 188 F.3d at 62 (citing *Hodel*, 452 U.S. at 302–03).  In *Catanzaro v. Weiden*, the Court of Appeals for the Second Circuit examined the propriety of a city official's decision to invoke an emergency procedure resulting in the destruction of the plaintiff's property, after the official had determined that it was rendered unsafe by a car accident. *See id.* at 58–61.  The Second Circuit held that "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion." *Id.* at 63.  The Second Circuit found that "this somewhat deferential standard" is

necessary to ensure that the law does not "discourage officials from taking prompt action to insure the public safety." *See id.* Applying these principles, in light of the undisputed fact that the building was severely damaged, the Second Circuit held that no reasonable juror could find that the official acted arbitrarily or otherwise abused his discretion in deciding to invoke the subject emergency procedures. *See id.* at 63–64.

Similarly here, there is "competent evidence" that Defendants reasonably believed an emergency existed at the time of each Exclusion Order because the "public [wa]s in immediate danger" due to the increased incidence of measles above the "baseline level" within the County. *See id.* It is undisputed that at the time of the December 3, 2018 Exclusion Order, a total of eighty-eight cases had been reported in the County since October 1, 2018. (Docket No. 79-11 at COR0000920-923). By December 21, 2018, that number had increased to 105 cases, and by February 7, 2019, it had risen to 140. N.Y. STATE MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch. In terms of new cases, as of December 1, 2018, twenty-three cases had been reported within the prior three weeks and four in the prior week; as of December 21, 2018, eleven new cases had been reported within the prior three weeks and three in the prior week; and as of February 2, 2019, there had been twelve new cases within the prior three weeks and one in the prior week. (*Id.*). All of these numbers indicate an incidence "above the baseline level" of seven or fewer cases reported in the entire State of New York over the course of a year, such that an "outbreak" had occurred as defined by the relevant regulations, triggering the exclusion procedure expressly permitted by that regulatory scheme. *See Catanzaro*, 188 F.3d at 63; N.Y. COMP. CODES R. & REGS. tit. 10 § 2.2(d); *id.* tit. 66 § 1.10.

Plaintiffs argue that "[n]o emergency existed." (Docket No. 83 at 10). However, *Catanzaro* teaches that whether an actual emergency existed is not the relevant inquiry. *See* 188

F.3d at 63; *see also WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 51–52 (2d Cir. 2009).

Rather, the inquiry is whether Defendants have provided sufficient and admissible evidence that

Defendants *reasonably believed* an emergency existed at the time of the exclusions. *See*

*Catanzaro*, 188 F.3d at 63.   The record before the Court establishes there is no issue of material

fact with respect to whether (1) the measles is highly-contagious and can cause serious

complications; (2) the incidence of new cases in the County had surpassed "baseline" levels

typical throughout the entire State in one year; and (3) New York law explicitly permitted the

subject exclusions at these thresholds. *See id.*   The Court finds that Defendants have met

*Catanzaro*'s requirements.   Indeed, the presence of serious and highly-contractable disease

within a community is "precisely the 'scenario for which emergency action would be expected.'"

*See Page v. Cuomo*, 478 F. Supp. 3d 355, 371 (N.D.N.Y. 2020) (quoting *Bayley's Campground*

*Inc. v. Mills*, 462 F. Supp. 3d 22, 36 (D. Me. 2020)) (dismissing procedural due process claim

based on executive order to control COVID-19 pandemic); *see also Compagnie Francaise de*

*Navigation a Vapeur v. Bd. of Health of State of La.*, 186 U.S. 380, 393 (1902) (finding that

foreign steamship company was not deprived of property without due process of law by state

board of health's prohibition of landing passengers in New Orleans due to existence of infectious

disease in that city); *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 419–20 (3d Cir.

2008) (holding that "far from perfect" response to health hazard caused by presence of mold in

apartments was permissible when "faced with a situation in which a failure to act quickly could

have serious health consequences"); *Workman v. Mingo Cty. Sch.*, 667 F. Supp. 2d 679, 691

(S.D.W. Va. 2009) (denying procedural due process claim based on mandatory school

immunization program to avoid "endangering the public health").[34]

---

[34] In short, this outcome comports with robust precedent in other constitutional contexts recognizing the State's broad police power to take steps to protect the public from outbreaks of disease through mandatory vaccination

Moreover, Defendants instituted the exclusions and other emergency measures with the advice and approval of numerous doctors at State DOH. (Defs. 56.1 ¶¶ 17, 28; Docket Nos. 79-10 at COR0000620; 79-6 at 59:22-60:16). Before excluding Plaintiffs' children from GMWS, Dr. Ruppert's disease control team and State DOH worked to monitor and quell the virus by implementing contact tracing and first limiting exclusions to unvaccinated students in schools that had already seen infections. (Defs. 56.1 ¶¶ 14-15, 19-24, 29; Docket No. 79-6 at 52:14-53:8).

Only in November 2018, when cases continued to rise, did Dr. Ruppert's team and State DOH collectively determine that it was necessary to broaden the exclusions to cover non-infected schools in "close geographic proximity" to infected schools and with "low" vaccination rates. (Defs. 56.1 ¶¶ 30-31, 37, 47). Therefore, on November 1, 2018, December 26, 2018 and January 30, 2019, State DOH authorized Dr. Ruppert to order schools in Rockland County "in close geographic proximity to other schools with a confirmed case of measles," to take steps to protect their students from the virus pursuant to N.Y. Comp. Codes R. & Regs. tit. 66, § 1.10. (Defs. 56.1 ¶¶ 19, 30; Docket No. 79-3, Ex. B at 34). Absent any facts to the contrary, this evidence provides ample support for the conclusion that Defendants reasonably believed the continued presence of the virus "presented an immediate public health threat" necessitating the GMWS exclusions. *See Webster v. Moquin*, 175 F. Supp. 2d 315, 321–22 (D. Conn. 2001) (finding that defendants reasonably believed that plaintiff's live birds infected by avian influenza created public health emergency after consultation with veterinarians); *see also Reynolds v. Krebs*, No. 06-CV-123S, 2008 WL 788603, at *4–6 (W.D.N.Y. Mar. 20, 2008), *aff'd*, 336 F.

---

laws. *See generally Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) (holding that mandatory vaccination law did not violate substantive due process under Fourteenth Amendment); *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) (rejecting substantive due process claim based on exclusion of children with religious exemptions to vaccination due to school outbreak of chickenpox).

App'x 27 (2d Cir. 2009) (hereinafter "*Reynolds I*") (granting summary judgment on procedural due process claim based on destruction of building where official consulted multiple professionals regarding structure's danger to the community).

Plaintiffs further argue that "defendants acted in an *ultra vires* manner" because it took "months" for the County and RCDOH "to act." (Docket No. 83 at 10).  Although a delay between an alleged emergency and objected-to governmental action may create a sufficient fact issue for trial as to whether the government acted arbitrarily in invoking the action, *see Burtnieks*, 716 F.2d at 988–89, the record establishes that any delay of the Exclusion Orders was part of an attempt to contain the virus using other, less drastic, methods first. (*See* Defs. 56.1 ¶¶ 14-15, 19-24, 29; Docket Nos. 79-3 ¶¶ 9-10; 79-6 at 52:14-53:8).  RCDOH, the County, Dr. Ruppert and State DOH took numerous actions in the first several days and weeks immediately following the first appearance of the measles in the community. (Defs. 56.1 ¶¶ 14-15, 19-24, 29; Docket Nos. 79-3 ¶¶ 9-10; 79-6 at 52:14-53:8).  Despite these initial efforts, the virus kept spreading.  The subject GMWS exclusions two months later were not an abuse of discretion, but were calculated and tailored responses deemed necessary to address the spreading virus. (Defs. 56.1 ¶¶ 30-31; Docket No. 79-6 at 51:17-53:17).   Therefore, the elapse of time between the initial measles cases and the GMWS exclusions is insufficient to create a material issue of fact. *Cf. Burtnieks*, 716 F.2d at 988–89.[35]

---

[35] The facts here are distinguishable from those in *Burtnieks*, where a three-month delay between the defendant-city's emergency declaration and demolition of the plaintiff's building gave rise to a genuine issue of fact as to whether the defendants truly needed to destroy the building without providing plaintiff a pre-deprivation opportunity to be heard. *See id.* at 987–89.  As explained, neither RCDOH, nor the County, nor Dr. Ruppert sat idle during the elapse of time between the initial measles cases and the GMWS exclusions.  Instead, they attempted to use other emergency measures to bring the virus under control, and when such measures did not work, resorted to the GMWS exclusions. (Defs. 56.1 ¶¶ 14-15, 19-24, 29; Docket Nos. 79-3 ¶¶ 9-10; 79-6 at 52:14-53:8).

Plaintiffs also complain that the excluded schools were "not geographically 'close'" to the communities with "a handful of active measles cases," and that Defendants should have mandated a quarantine rather than enacting the subject exclusions. (*See* Docket No. 83 at 10-11). However, Plaintiffs do not submit reliable evidence to contest Defendants' evidence that there were 307 measles cases within a five-mile radius of GMWS throughout the entire outbreak. (Docket No. 79-12 at 2; *see supra* n.24).  Furthermore, Dr. Ruppert testified that RCDOH did not implement a quarantine at the time of the exclusions because it lacked sufficient staffing, even with the "limited" additional support they expressly requested and obtained from State DOH within weeks of the resurgence.[36] (Docket No. 79-7 at 57:18-58:11).

More importantly, Plaintiffs' attempt to second-guess these decisions constitutes impermissible "hindsight analysis" proscribed by *Catanzaro* as likely to "encourage delay and . . . potentially increase the public's exposure to dangerous conditions." *See* 188 F.3d at 63. Therefore, it is not appropriate for the Court to consider whether exclusions based on zip codes, or a mandatory quarantine, were the best strategies to handle the resurgence, even if GMWS never experienced an outbreak. *See id.*  If such an inquiry were required, "in order to avoid the possibility of committing any constitutional violation, an official charged with discretion would be in the anomalous position of almost being forced to hold a hearing to determine whether or not an emergency exists, so as to then determine whether a predeprivation hearing is constitutionally required. This cannot be the proper result." *See id.*  In light of the fact that the concentration of measles cases within miles of GMWS was above the "baseline" as defined by New York law throughout the relevant period, and the resources available to RCDOH were

---

[36] Absent admissible evidence to the contrary, the Court disregards Plaintiffs' unsupported assertion that "the county health department [did not] request[] additional staff to allow it to effectively quarantine." *See Fastiggi v. Comm'r of Soc. Sec.*, No. 11 Civ. 997(RA), 2014 WL 1285125, at *5 (S.D.N.Y. Mar. 31, 2014); (Docket No. 83 at 10).

limited, Plaintiffs have not adduced evidence sufficient to allow a reasonable finder of fact to

conclude that the exclusions were arbitrary or constitute an abuse of discretion. *See id.*; *see also*

*WWBITV*, 589 F.3d at 52 (finding that even "[a]ssuming *arguendo* that plaintiffs have raised

valid questions about whether the Village chose the best possible method of safeguarding the

public, such a showing is not sufficient to defeat summary judgment").

**(b) Post-Deprivation Remedy**

Because Defendants have adduced sufficient evidence that they ordered the exclusions

based on a reasonable belief that they were facing an emergency, the Court must evaluate

whether a meaningful post-deprivation remedy was available to Plaintiffs. *See Kshel*, 293 F.

App'x at 15–16.  A state may satisfy the requirements of procedural due process in emergency

situations by making available "'some meaningful means by which to assess the propriety of the

State's action at some time after the initial taking.'" *WWBITV*, 589 F.3d at 50 (quoting *Parratt*,

451 U.S. at 539).

Courts have consistently held that an Article 78 proceeding is an adequate post-

deprivation remedy for the destruction of a constitutionally-protected property interest during an

emergency. *See, e.g.*, *Lilakos v. New York City*, 808 F. App'x 4, 9–10 (2d Cir. 2020) (summary

order); *Ferran v. City of Albany*, 1:14-cv-1362 (GLS/ATB), 2019 WL 6611301, at *5 (N.D.N.Y.

Dec. 5, 2019); *Seedan Real Estate Holding, LLC v. Leary*, 3:16-cv-00595 (NAM/DEP), 2018

WL 6830707, at *11 (N.D.N.Y. Dec. 28, 2018).  This is because such a proceeding presents an

opportunity to review whether a state agency or officer "failed to perform a duty enjoined upon it

by law," or whether a specific act was "made in violation of lawful procedure, was affected by

an error of law or was arbitrary and capricious or an abuse of discretion," *see* N.Y. C.P.L.R. §

7803 (2019), thereby "avoiding the constitutional thicket," *see Jackson v. Roslyn Bd. of Educ.*,

652 F. Supp. 2d 332, 345 (E.D.N.Y. 2009) (quoting *Giglio v. Dunn*, 732 F.2d 1133, 1134 (2d Cir. 1984)).

Here, an Article 78 proceeding was available, as Plaintiffs pursued this very remedy and obtained the relief they sought — a preliminary injunction enjoining the Third Exclusion Order so that their children could return to school. *See Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d 245, 254–55 (E.D.N.Y. 2014) (finding that "plaintiffs' ability to force the reopening of their store show[ed] that the procedures under Article 78 [we]re more than adequate postdeprivation remedies for the purposes of due process"). Moreover, Plaintiffs' conclusory allegations that their Article 78 proceeding was inadequate are insufficient to support their argument that they were denied a meaningful opportunity to contest the validity of the Exclusion Order. *See Parratt*, 451 U.S. at 538–39; *Catanzaro*, 188 F.3d at 64. Therefore, Plaintiffs' procedural due process claim as applied to the Exclusion Orders is dismissed.

## 2. Emergency Declaration

Plaintiffs argue that Day's Emergency Declaration constituted an additional procedural due process violation by prohibiting their children from attending school.[37] (Docket Nos. 35 ¶¶ 73-80; 83 at 11). This aspect of Plaintiffs' procedural due process claim requires separate analysis from the Exclusion Orders because the propriety of the Declaration stems from N.Y. Executive Law § 24, the statute outlining a local executive's authority to declare a state of emergency in New York. *See* N.Y. EXEC. LAW § 24 (2019) (amended 2020); N.Y. COMP. CODES

---

[37] Plaintiffs do not specifically mention the Emergency Declaration as grounds for their procedural due process claim in paragraph 80 of their Amended Complaint, which asserts this cause of action in relation to "defendants' . . . exclusion orders." (Docket No. 35 ¶ 80). However, the Emergency Declaration is mentioned several times in Plaintiffs' factual allegations, (*see id.* ¶ 73-78), and both parties addressed it apropos of the procedural due process claim in their summary judgment briefings, (*see* Docket Nos. 81 at 22; 83 at 11; 87 at 4). The Court therefore will address it in the procedural due process context since any ambiguity regarding this claim was resolved through the briefing. *See Tuccio Dev., Inc. v. Town of Brookfield*, No. 08cv1016 (MRK), 2010 WL 2794192, at *9 n.3 (D. Conn. July 14, 2010), *aff'd sub nom. Tuccio Dev., Inc. v. Miller*, 423 F. App'x 26 (2d Cir. 2011); *Laselva v. Schmidt*, No. 8:08-CV-112 (GLS/RFT), 2009 WL 1312559, at *3 (N.D.N.Y. May 7, 2009).

R. & REGS. tit. 66, § 1.10; (Docket No. 85-1 at 2).  However, this portion of the claim still fails as a matter of law because Plaintiffs have neither stated a viable property interest in sending their children to school without vaccination at the time of the Declaration, nor raised a triable issue of fact as to whether issuance of the Declaration constituted an abuse of discretion. *See Catanzaro*, 188 F.3d at 63; *Bey*, 2009 WL 2924429, at *15.

### i. Plaintiffs Have Not Asserted a Protected Property Interest

As explained above, because property interests are created by state law-rules that confer a "legitimate claim of entitlement" to an alleged benefit, the Court turns to the plain language of the laws Plaintiffs argue create their alleged property interest in sending their unvaccinated children to school. *See Roth*, 408 U.S. at 577; *see also Ace Partners*, 883 F.3d at 195.  At the time of the Declaration, Plaintiffs lacked any property interest in exercising their religious exemptions because their entitlement to that benefit hinged on the "chief executive['s]" discretion under N.Y. Executive Law § 24. *See* N.Y. EXEC. LAW § 24(1); *RR Vill. Ass'n*, 826 F.2d at 1201–02.

N.Y. Executive Law § 24 provides, in relevant part:

Notwithstanding any inconsistent provision of law, general or special, in the event of a disaster, rioting, catastrophe, or similar public emergency within the territorial limits of any county, city, town or village, or in the event of reasonable apprehension of immediate danger thereof, and upon a finding by the chief executive thereof that the public safety is imperiled thereby, such chief executive *may* proclaim a local state of emergency within any part or all of the territorial limits of such local government . . . Following such proclamation and during the continuance of such local state of emergency, the chief executive may promulgate local emergency orders to protect life and property or to bring the emergency situation under control. As illustration, such orders *may*, within any part or all of the territorial limits of such local government, provide for:
. . .
c. the regulation and closing of places of amusement and assembly;
. . .
e. the prohibition and control of the presence of persons on public streets and places[.]

N.Y. EXEC. LAW § 24(1) (emphasis added).

The word "may" in this section empowers the "chief executive"[38] to take the listed actions at his discretion upon determining the existence of a "public emergency" or "disaster," despite the existence of any laws to the contrary. *See* N.Y. EXEC. LAW § 24(1); *see also Citizens Accord*, 2000 WL 504132, at *13. Therefore, although New York law bestowed on Plaintiffs the right to send their unvaccinated children to school pursuant to religious exemptions under ordinary circumstances, during a "disaster" or "public emergency," N.Y. Executive Law § 24 counterpoised that right with Day's authority to "regulat[e] . . . places of assembly" and to "prohibit[] and control . . . the presence of persons [i]n public . . . places." *See* N.Y. EXEC. LAW § 24(1)(c), (e). Pursuant to that authority, the Emergency Declaration prohibited unvaccinated children from gathering in "public place[s] of assembly," which it defined to include schools. (Docket No. 85-1 at 2-3) ("A place of public assembly shall be a place where more than 10 persons are intended to congregate for purposes such as . . . educational purposes").

Therefore, whether Plaintiffs possessed a "legitimate claim to entitlement" in sending their children to school despite the Emergency Declaration turns on whether there was a "public emergency" or "disaster" as defined by N.Y. Executive Law § 24. *See RR Vill. Ass'n*, 826 F.2d at 1201–02. At the time of the Declaration, in March 2019, the statute defined the word "disaster" as:

> [The] occurrence or imminent threat of wide spread or severe damage, injury, or loss of life or property resulting from any natural or man-made causes, including, but not limited to, fire, flood, earthquake, hurricane, tornado, high water, landslide, mudslide, wind, storm, wave action, volcanic activity, *epidemic*, air contamination, terrorism, cyber event, blight, drought, infestation, explosion, radiological accident, nuclear, chemical,

---

[38] According to the definition section, the term "chief executive" means, among other things, "a county executive or manager of a county." N.Y. EXEC. LAW § 20(2)(f).

biological, or bacteriological release, water contamination, bridge failure or bridge collapse.

N.Y. EXEC. LAW § 20(2) (emphasis added).  The statute does not define the terms "epidemic" or "public emergency." *See id.*

Plaintiffs argue that none of these situations triggered the Emergency Declaration. (Docket No. 35 at ¶ 54).  In Plaintiffs' Article 78 proceeding, the Supreme Court, County of Rockland agreed, finding that for purposes of a preliminary injunction, Day lacked authority to issue the Emergency Declaration because there was no "epidemic" or any similar situation under Executive Law § 24. *See W.D.*, 63 Misc.3d at 936.  To arrive at this conclusion, the court considered two dictionary definitions of the word "epidemic:" (1) "an outbreak of disease that spreads quickly and affects many individuals at the same time;" and (2) "affecting or tending to affect a disproportionately large number of individuals within a population, community, or region at the same time." *See id.*; MERRIAM-WEBSTER ONLINE DICTIONARY, epidemic, https://www.merriam-webster.com/dictionary/epidemic (last visited Feb. 22, 2021).  Because there had been 166 measles cases out of about 330,000 residents in the entire County between October 1, 2018 and the date of the proceeding, April 5, 2019 — an infection rate of .05% — the court found that the number of cases "d[id] not rise to the level of an 'epidemic' as included in the definition of 'disaster' under Executive Law § 24." *See W.D.*, 63 Misc.3d at 936.  The court further explained that as required by the second definition, the disease did not "affect a disproportionately large number of individuals within [the] population" of the County "at the same time." *See id.*  For this reason, and because there were no measles cases at GMWS at the time of the Declaration, the court rescinded the Declaration and ordered that Plaintiffs' children be permitted to return to school. *See id.*;

*W.D.*, No. 031783/2019 (Sup. Ct. Rockland Cnty. Apr. 5, 2019) (granting order to show

cause).[39]

      The Court respectfully disagrees with this conclusion.[40]  The Court finds that an

"epidemic" as defined by N.Y. Executive Law § 24 did exist at the time of the

Emergency Declaration, such that Day had discretion to "prohibit . . . the presence of

persons from public places," *see* N.Y. EXEC. LAW § 24(1)(e), and therefore exclude

unvaccinated children from schools, *see Citizens Accord*, 2000 WL 504132, at *13.  The

Supreme Court, County of Rockland misapplied the definition of the word "epidemic,"

resulting in an outcome that the drafters of N.Y. Executive Law § 24 did not intend. *See*

*1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 259 (2d Cir. 2014) ("[I]t is . . .

'fundamental that a court, in interpreting a statute, should attempt to effectuate the intent

of the Legislature.'") (quoting *Majewski v. Broadalbin–Perth Cent. Sch. Dist.*, 91 N.Y.2d

577, 583 (1998)).  The court relied on the definition of "epidemic" as an adjective, even

though N.Y. Executive Law § 20 uses it as a noun to define the word "disaster." *See*

*W.D.*, 63 Misc.3d at 936; N.Y. EXEC. LAW § 20(2)(a) ("As used in this article the

---

[39] The court also rescinded the Emergency Declaration on the grounds that it purported to last for thirty days, when N.Y. Executive Law § 24 limits the duration of such orders to five days. *See W.D.*, 63 Misc.3d at 936; *see also* N.Y. EXEC. LAW § 24(2).

[40] This Court's decision is not precluded by the Supreme Court, County of Rockland's ruling because, assuming, *arguendo*, that the two proceedings involve identical issues, such issues were not "actually decided" as required for issue preclusion to take effect. *See Flaherty v. Lang*, 199 F.3d 607, 612–13 (2d Cir. 1999).  In order to determine the preclusive effect of a state-court decision, a federal court looks to the law of that state and should not give the state-court decision any greater preclusive effect than the courts of that state would give it. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012).  The Supreme Court, County of Rockland granted Plaintiffs' preliminary injunction, but later dismissed the action as moot under the rationale that the resurgence had ended and the New York legislature repealed all religious exemptions to vaccination. *See W.D.*, No. 031783/2019 (Sup. Ct. Rockland Cnty. Aug. 21, 2019).  Under New York law, neither a ruling on a preliminary injunction nor dismissal on mootness grounds have preclusive effect because neither is an adjudication on the merits. *See Lopez v. City of New York*, 17 Civ. 3014 (VEC) (AJP), 2017 WL 4342203, at *9 (S.D.N.Y. Sept. 28, 2017), *report and recommendation adopted*, 2018 WL 1371164 (S.D.N.Y. Mar. 15, 2018); *Hell's Kitchen Neighborhood Ass'n v. Bloomberg*, No. 05 Civ. 4806(SHS), 2007 WL 3254393, at *4 (S.D.N.Y. Nov. 1, 2007).

following terms shall have the following meanings . . . 'disaster' means occurrence or imminent threat of wide spread or severe damage, injury, or loss of life or property resulting from any natural or man-made causes, including, but not limited to . . . epidemic"); MERRIAM-WEBSTER ONLINE DICTIONARY, epidemic, https://www.merriam-webster.com/dictionary/epidemic.  As a general rule of construction, "[i]t is assumed that the legislature is aware of the rules of grammar when fashioning a statute." *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 319 (E.D.N.Y. 2006), *aff'd*, 612 F.3d 705 (2d Cir. 2010) (citing *Flora v. United States*, 362 U.S. 145, 150 (1960)).  As a result, the court should have relied on the definition of "epidemic" as a noun since that is how the word is used in the grammatical construction of the statute. *See id.*; *see also Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009) (interpreting statutory term according to "ordinary English grammar").

Consequently, the Court finds that the continuing resurgence of measles cases in the County as of the Emergency Declaration constituted an "epidemic," and therefore qualified as a "disaster" under N.Y. Executive Law §§ 20 and 24.  As a noun, an "epidemic" is "an outbreak of disease that spreads quickly and affects many individuals at the same time." MERRIAM-WEBSTER ONLINE DICTIONARY, epidemic, https://www.merriam-webster.com/dictionary/epidemic. Because 152 cases had been reported within the County as of March 25, 2019, the day before the Emergency Declaration, with twenty-five new cases in the prior three weeks and six in the prior week, the disease "affect[ed] many individuals at the same time," especially compared to seven or fewer cases counted across the State over a whole year in the years of 2015 through 2017. *See* MERRIAM-WEBSTER ONLINE DICTIONARY, epidemic, https://www.merriam-webster.com/dictionary/epidemic; NEW YORK STATE MEASLES WATCH,

https://nyshc.health.ny.gov/web/nyapd/measles-watch; Defs. 56.1 ¶ 59.[41]  In an analogous

proceeding by religious parents in Williamsburg, Brooklyn against a measles vaccination

mandate pursuant to the New York City Health Code, the Supreme Court, Kings County also

relied on the definition of "epidemic" as a noun and reached the same conclusion. *See C.F. v.*

*New York City Dep't of Health and Mental Hygiene*, No. 508356/19, 2019 WL 1744248, at *2

n.3 (Sup. Ct. Kings Cnty. Apr. 18, 2019) (hereinafter "*C.F. I*").  In declining to overturn the

mandate, the court stated:

> This court notes, but takes exception to the recent decision of the Supreme Court
> in Rockland County wherein the court looks to the percentage of [the] overall
> population affected to determine whether there is an epidemic.  The appropriate
> measure is rather the sudden percentage rise in infection experienced by the
> subject population.  If one were to wait till a significant percentage of [the]
> overall population were infected, disaster would inevitably ensue.

*Id.*

Given the explicit grammatical distinction made by the legislature, and the undisputed

fact that the measles cases in Rockland County constituted a substantial increase above typical

levels, the Court concludes that an "epidemic," and therefore, a "disaster" existed at the time of

the Emergency Declaration. *See id.*; *see also* N.Y. EXEC. LAW §§ 20, 24.  This situation triggered

Day's discretion under N.Y. Executive Law § 24 to "prohibit" individuals within the County,

including unvaccinated children, from congregating in public places such as schools. *See* N.Y.

EXEC. LAW § 24(1)(e).  Consequently, Plaintiffs lacked any legitimate claim of entitlement to

send their children to school without being vaccinated. *See Roth*, 408 U.S. at 577.  Absent a

---

[41] *See also* COMMUNICABLE DISEASE IN NEW YORK STATE CASES REPORTED IN 2017,
https://www.health.ny.gov/statistics/diseases/communicable/2017/docs/cases.pdf; COMMUNICABLE DISEASE IN NEW
YORK STATE CASES REPORTED IN 2016,
https://www.health.ny.gov/statistics/diseases/communicable/2016/docs/cases.pdf; COMMUNICABLE DISEASE IN NEW
YORK STATE CASES REPORTED IN 2015,
https://www.health.ny.gov/statistics/diseases/communicable/2015/docs/cases.pdf.

constitutionally protected property interest, Plaintiffs' procedural due process claim as applied to the Emergency Declaration fails as a matter of law. *See Bey*, 2009 WL 2924429, at *15–17; *Police Benevolent Ass'n of The N.Y. State Troopers*, 477 F. Supp. 2d at 544–45.

### ii.  The Process Plaintiffs Received Was Adequate

Assuming, *arguendo*, that Plaintiffs have stated a viable property interest in sending their children to school despite the Emergency Declaration, their procedural due process claim still fails because they have not raised a triable issue of material fact as to whether the process they received through their Article 78 proceeding was inadequate. *See Catanzaro*, 188 F.3d at 63–64. This is because Defendants have produced sufficient evidence that as of the Declaration, they reasonably believed there continued to be an emergency due to the higher incidence of measles cases such that "meaningful predeprivation process" was "impracticable." *See Parratt*, 451 U.S. at 539–41; *id.*

### (a)  Reasonableness of Emergency Procedures

As explained, the State only violates the Due Process Clause by failing to provide a pre-deprivation remedy "'when an emergency procedure is invoked in an abusive and arbitrary manner.'" *Reynolds II*, 336 F. App'x at 29 (quoting *Catanzaro*, 188 F.3d at 62).  To determine whether there is a due process violation, the Court considers whether there is "competent evidence" that Defendants "reasonably believe[d] that an emergency d[id] in fact exist, or that affording predeprivation process would be otherwise impractical,"  or whether their invocation of the Emergency Declaration "[wa]s arbitrary or amount[ed] to an abuse of discretion." *See Catanzaro*, 188 F.3d at 63.

Here, the record establishes that Defendants did not act arbitrarily or abuse their discretion in issuing the Emergency Declaration.  On March 21, 2019, State DOH circulated data demonstrating that cases within the County were continuing to spike and the majority were still

in children under the age of twenty. (Defs. 56.1 ¶ 58; Docket No. 79-11 at COR0001095).

Furthermore, between October 1, 2018 and March 25, 2019, a total of 152 cases had been

reported within the County. (*See* Defs. 56.1 ¶ 59; Pl. 56.1 ¶ 59).  Moreover, twenty-five cases

had been reported in the prior three weeks, with six cases in the prior week. NEW YORK STATE

MEASLES WATCH, https://nyshc.health.ny.gov/web/nyapd/measles-watch.  The continued

presence of cases above typical levels across the County constitutes readily admissible and

sufficient evidence that Defendants reasonably believed the situation was emergent, requiring

immediate measures to prevent unvaccinated children from catching and spreading the virus. *See*

*Catanzaro*, 188 F.3d at 63; *see also Webster*, 175 F. Supp. 2d at 321–22.

      Plaintiffs argue that Defendants' actions were "motivated by their hostility toward the

religious exemption rather than any actual public health measure" because "there were a small

handful of active measles cases in Hasidic neighborhoods," but none at GMWS, and the County

still had not quarantined those infected by or exposed to the measles. (Docket No. 83 at 11).

However, even if there were only a "small handful" of active cases at one time, it was reasonable

to interpret this number as emergent given the typically lower concentration of cases across the

State in a single year, and the fact that State DOH was still reporting new cases almost six

months after the virus arrived. *See Webster*, 175 F. Supp. 2d at 321–22.

      Plaintiffs further contend that the Declaration had no "public health purpose" because it

specifically restricted the movements of "healthy children who had religious exemptions" to

school vaccination requirements, rather than children who were ill or children with medical

exemptions. (Docket No. 83 at 4, 11).  First, the Declaration did not specifically target children

with religious exemptions to school vaccination.  Rather, it covered children over six months old

"not vaccinated against measles for *any reason* other than being serologically immune" to the

disease or unable to receive the vaccine due to medical reasons documented by a physician. (Docket No. 79-13 at 3). Therefore, the Declaration applied to children who remained unvaccinated for religious reasons *and* other reasons, such as mistrust of modern medicine or not needing to comply with school vaccination requirements because they were homeschooled. (*See id.*). The Court finds that the Declaration was clearly directed towards a public health goal, as the disease continued to be prevalent in children and the covered children were unvaccinated, and therefore, most susceptible to contracting and spreading the virus. *See Catanzaro*, 188 F.3d at 63. Plaintiffs' argument that these strategies constitute an abuse of discretion because no cases ever arose at GMWS and there was never a mandatory quarantine constitutes impermissible second-guessing of Defendants' policy decisions. *See id.*; *see also Jacobson*, 197 U.S. at 25; *Elsmere Park Club*, 542 F.3d 419–20.

**(b) Post-Deprivation Remedy**

The Court is satisfied that the record establishes as a matter of law that Defendants issued the Emergency Declaration pursuant to a reasonable belief that the County faced an emergency. Therefore, the Court turns to whether a constitutionally adequate post-deprivation remedy was available. *See Kshel*, 293 F. App'x at 15–16. As previously explained, where a property interest is infringed during an emergency, an Article 78 proceeding is an adequate post-deprivation remedy to satisfy the Due Process Clause. *See Lilakos*, 808 F. App'x at 9–10.

Here, as with the Exclusion Orders, the State satisfied any alleged right to due process by hearing Plaintiffs' Article 78 petition to overturn the Emergency Declaration, and granting that request. *See Ahmed*, 7 F. Supp. 3d at 254–55. Plaintiffs therefore cannot establish that they were denied a meaningful opportunity to contest the validity of the exclusions. *See Parratt*, 451 U.S. at 538–39; *Catanzaro*, 188 F.3d at 64. Consequently, Plaintiffs' procedural due process claim as applied to the Emergency Declaration is also dismissed.

-41-

**B. Free Exercise**

Plaintiffs also allege that the Emergency Declaration violated the Free Exercise Clause of the First Amendment because it "intentionally targeted persons with sincerely-held religious beliefs" by barring from public places children with religious exemptions to vaccination, but not children with medical exemptions or adults over the age of eighteen, without a compelling reason for doing so. (Docket No. 35 ¶¶ 82-83). Plaintiffs argue that this mandate substantially burdened their religious beliefs by forcing them "to either engage in acts prohibited by their faith, that is, vaccinate, or lose state-created rights," including the right to a public education. (Docket No. 83 at 15).

The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, *see Cantwell v. Conn.*, 310 U.S. 296, 303–04 (1940), provides in relevant part that "Congress shall make no law . . . prohibiting the free exercise [of religion],” U.S. Const. amend. I. The Free Exercise Clause provides two major protections: freedom to believe and freedom to act in accordance with one's beliefs. *See Cantwell*, 310 U.S. at 303–04. While the right to believe freely is "absolute" — the government may not dictate what citizens think — the right to act is qualified by a duty to comply with the law. *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 485 U.S. 660, 670 n.13 (1988) (hereinafter "*Smith I*"); *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878). Although the Free Exercise Clause protects the performance of acts such as assembling for worship, it "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Cent. Rabbinical Cong. of United States & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Emp't. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (hereinafter "*Smith II*")).

-42-

Generally applicable and neutral laws that incidentally burden religious practice are subject to rational basis review, where a law is "presumed . . . valid" as long as it is "rationally related to a legitimate state interest." *Id.* at 186 n.2 (quoting *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007)).  However, laws that substantially burden religious exercise, and that are not both neutral and generally applicable, are subject to strict scrutiny, a more exacting standard. *See generally Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).  Under that standard, the subject law is constitutional only if it advances a compelling government interest and is narrowly tailored to promote that interest, *i.e.*, "is the least restrictive means of achieving" it. *See id.* at 531–32, 578 (Blackmun, J., concurring) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

Here, the Emergency Declaration is subject to rational basis review because it is both facially neutral and generally applicable. *See id.* at 531–32; *Cent. Rabbinical Cong.*, 763 F.3d at 193.  Under rational basis review, Defendants have demonstrated that the Declaration served the legitimate government purpose of protecting the County's community from the measles outbreak. *Cf. Smith II*, 494 U.S. at 1613–14 (O'Connor, J., concurring).  Moreover, even if strict scrutiny applied, the Emergency Declaration satisfies that standard as well.

**1. Neutrality**

**i. Facial Neutrality**

A law is not neutral if it is "specifically directed at [a] religious practice." *Cent. Rabbinical Cong.*, 763 F.3d at 193 (quoting *Smith II*, 494 U.S. at 878).  To determine whether a law is neutral, the court begins with its text, as "the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* (quoting *Lukumi*, 508 U.S. at 533).  A law is not facially neutral "if [the text] refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. at 533.  Even if a law is deemed facially neutral,

however, it may still violate the Free Exercise Clause if it "targets religious conduct for

distinctive treatment." *Id.* at 534.  Therefore, in determining whether a law is neutral, a court

must also "survey meticulously the circumstances of governmental categories to eliminate . . .

religious gerrymanders." *Id.* (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696

(1970) (Harlan, J., concurring)).

Beginning with the text of the Declaration, the Court finds that it does not explicitly

target religious practice.  The Declaration states, in relevant part, that from March 27, 2019 to

April 25, 2019:

> [N]o parent or guardian of a minor or infant under the age of 18, shall cause, allow,
> permit, or suffer a minor or infant under their supervision, to enter any place of
> public assembly in Rockland County, if that minor or infant is not vaccinated
> against measles for any reason other than being serologically immune to measles
> as documented by a physician, or prevented from receiving a measles vaccination
> for a medical reason documented by a physician, or because the infant is under the
> age of 6 months.

(Docket No. 79-13 at 3).  The term "place of public assembly" is defined as "a place where more

than 10 persons are intended to congregate for purposes such as civic, governmental, social, or

religious functions, or for recreation or shopping, or for food or drink consumption, or awaiting

transportation, or for daycare or educational purposes, or for medical treatment," as well as

"public transportation vehicles, including but not limited to, publicly or privately owned buses or

trains." (*Id.*).  None of the categories of persons affected by the Declaration are described in

terms of their religion. (*Id.*).  Rather, it applies to children between six months and eighteen years

old who were unvaccinated "for *any* reason," except those with documented medical reasons

preventing vaccination or those deemed serologically immune. *Cf. Commack Self-Serv. Kosher*

*Meats, Inc. v. Hooker*, 680 F.3d 194, 210–11 (2d Cir. 2011) (finding that Kosher food labeling

law was neutral because it applied to consumers who purchased kosher products "for reasons unrelated to religious observance"); (*Id.*) (emphasis added).

Moreover, although the Declaration restricts religious gatherings, the mere fact that a law mentions religion does not necessarily mean that it is not facially neutral. *See Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, 128 F. Supp. 3d 566, 581 (E.D.N.Y. 2015) (hereinafter "*Roman Catholic Diocese of Rockville Ctr.*"); *see also Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020).  Although the Declaration prohibits unvaccinated children from places intended to house ten or more persons for "religious functions," *i.e.*, houses of worship, the Declaration does not facially target religion because it imposes the exact same restrictions on gatherings in virtually all public secular places, such as those used for education, recreation, shopping and food consumption. *See Roman Catholic Diocese of Rockville Ctr.*, 128 F. Supp. 3d at 581–82 & n.22 (holding that zoning code amendment regulating houses of worship was facially neutral because it modified the zoning code to impose equally stringent restrictions on religious, business, industrial and residential uses alike); (Docket No. 79-13 at 3).  Nor does it expressly carve out a category for religious conduct and subject that category to more severe restrictions than any other. *See Lukumi*, 508 U.S. at 547 (Scalia, J., concurring in part) ("the defect of lack of neutrality applies primarily to those laws that *by their terms* impose disabilities on the basis of religion") (emphasis in original).

The Supreme Court recently explained in a per curiam opinion that certain New York State executive orders relating to the COVID-19 pandemic "c[ould not] be viewed as neutral because they single[d] out houses of worship for especially harsh treatment." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (hereinafter "*Roman Catholic Diocese*

*III*").[42]  The text of those orders expressly created a separate category of harsher restrictions for

houses of worship *alone* — even though none had experienced outbreaks since reopening with

more moderate restrictions, and even though the Governor acknowledged that secular institutions

that were not similarly "single[d] out" had actually contributed to the spread of COVID-19.  *See*

*id.* at 66.  For example, whereas in a red zone, a 1,000-seat church or 400-seat synagogue would

be limited to ten people, a large store could "literally have hundreds of people shopping there on

any given day." *Id.* at 67.  Because these express categorizations were far more severe than any

other COVID emergency order that had come before the Supreme Court, *see id.* at 67 & n.2

(citing *S. Bay United Pentecostal Church v. Newsom*, 590 U.S. __, 140 S. Ct. 1613 (2020)

(hereinafter "*S. Bay I*") (upholding order limiting in-person worship to 25% capacity or 100

people, whichever was lower); *Cavalry Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020)

(upholding directive limiting in-person worship services to fifty people)), and because the

categorizations led to disparate results despite availability of less restrictive measures to control

the virus, the Supreme Court found that they likely were not narrowly tailored to the

government's compelling interest in stemming the spread of the virus.[43]  *See Roman Catholic*

*Diocese III*, 141 S. Ct. at 67.

---

[42] The decision emanated from two cases brought by Catholic and Orthodox Jewish institutions who claimed that the orders, promulgated by Governor Andrew Cuomo of the State of New York ("Governor Cuomo"), were discriminatory because they unjustifiably treated religious institutions worse than similar secular institutions and businesses. *See generally Roman Catholic Diocese of Brooklyn v. Cuomo*, 20-CV-4844 (NGG) (CLP), 2020 WL 6120167 (E.D.N.Y. Oct. 16, 2020) (hereinafter "*Roman Catholic Diocese I*"); *Agudath Israel of Am. v. Cuomo*, No. 1:20-cv-04834-KAM-RML (E.D.N.Y. filed Oct. 8, 2020).  Although the Second Circuit initially upheld the orders pending appeal, *Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 182 (2d Cir. 2020) (hereinafter "*Roman Catholic Diocese II*"), the Supreme Court reversed, finding that they were not facially neutral nor generally applicable, and unlikely to survive strict scrutiny, *Roman Catholic Diocese III*, 141 S. Ct. at 67, 69.

[43] In light of that decision, on remand, the Second Circuit preliminarily enjoined enforcement of the orders' occupancy restrictions in red and orange zones, holding that they likely violated the Free Exercise Clause. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (hereinafter "*Roman Catholic Diocese IV*").  It also remanded to the District Court the issue of whether the percentage capacity restrictions could survive strict scrutiny, as that issue was raised for the first time on appeal. *Id.* at 634–35, 637.

Here, the Emergency Declaration does not "single out" religious groups for harsher treatment. *See Roman Catholic Diocese III*, 141 S. Ct. at 66. The language of the Emergency Declaration says nothing about religion except to group religious and secular gatherings in public places *together*, and targets unvaccinated children within a certain age bracket without distinguishing whether they were religious or not. *See Roman Catholic Diocese of Rockville Ctr.*, 128 F. Supp. 3d at 581–82 & n.22. The Emergency Declaration simply does not create a special category of harsher treatment for religious conduct alone, either by its terms or operation.

## ii. Discriminatory Intent

Apart from its text, courts also evaluate whether a law has a discriminatory intent by considering direct and circumstantial evidence, an approach borrowed from equal protection jurisprudence. *See Lukumi*, 508 U.S. at 540 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). To establish discriminatory intent, Plaintiffs must show that the government "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Relevant evidence includes "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540. Intent to discriminate may also be demonstrated by a "series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.

Here, Plaintiffs allege that there are material issues of fact regarding whether the Declaration was enacted with a discriminatory motive because Day's comments regarding religious exemptions in April 2019 "spewed vitriol at those with sincerely-held religious

beliefs." (Docket No. 83 at 17).  Day made these comments several weeks after the Declaration

was rescinded, while lobbying New York legislators to repeal religious exemptions to school

vaccination. (Docket Nos. 83 at 11; 85-16 at 8-10).  Day opined that the religious exemptions

constituted "a hole in the system . . . being abused" by "anti-vaxxers" and that "[t]here is no such

thing as a religious exemption." (Docket No. 85-16 at 8-9).  Even assuming that such statements

are relevant to Day's intent in promulgating the Declaration,[44] as previously explained, Day's

comments taken as a whole evince a public health message focused on protecting the community

from the outbreak, preventing infant hospitalizations, and prohibiting individuals from putting

others at risk by taking advantage of religious exemptions for non-religious reasons. (*See* Docket

No. 85-16 at 8-10).  Nowhere do his statements condemn the decision not to vaccinate a child

pursuant to sincerely-held religious beliefs, or religion in general. (*See id.*).  Furthermore, they

do not raise a triable issue of fact as to discriminatory intent because none of Day's statements

are derogatory, nor do they indicate "active hostility" towards religion, (*see* Docket No. 83 at

14), or an intent to single out any religious group because of its religious beliefs, *see Lukumi*, 508

U.S. at 540; *Feeney*, 442 U.S. at 279.

---

[44] Courts have held that post-enactment statements are minimally probative of a law's intent. *See Barber v. Thomas*,
560 U.S. 474, 486 (2010) ("And whatever interpretive force one attaches to legislative history, the Court normally
gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has
become law.") (emphasis in original); *see also Edwards v. Aguillard*, 482 U.S. 578, 596 n.19 (1987) ("The Court has
previously found the post-enactment elucidation of the meaning of a statute to be of little relevance in determining
the intent of the legislature contemporaneous to the passage of the statute."); *Doe v. Bridgeport Police Dep't*, 198
F.R.D. 325, 348 n.16 (D. Conn. 2001), *modified*, 434 F. Supp. 2d 107 (D. Conn. 2006) (disregarding affidavit of
member of state House of Representatives seeking to explain intent of legislature in passing enactments after-the-
fact).  Day's statements are arguably even less relevant to the intent behind the Declaration because they do not
address the Declaration at all, but rather, concern the legislative repeal of religious exemptions, a separate and
distinct initiative. (Docket No. 85-16 at 8-10).  However, given the low standard for relevance in federal court, *see
United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008), and that Plaintiffs argue that the Declaration and
repeal together constitute a "series of official actions taken for invidious purposes," *see Arlington Heights*, 429 U.S.
at 267, the Court will consider Day's statements, *see Muhammad v. New York City Transit Auth.*, 52 F. Supp. 3d
468, 489 (E.D.N.Y. 2014) (considering discriminatory nature of "later policies" to determine neutrality of policy at
issue).

Here, since Day's comments do not single out religion as problematic and express concern regarding "babies in ICUs" and a "medical disaster," no reasonable juror could conclude that this evidence constitutes religious animus. *See* Docket No. 85-16 at 9-10; *see also Irshad Learning Ctr. v. Cty. of Dupage*, 937 F. Supp. 2d 910, 940 (N.D. Ill. 2013) (holding there was no evidence of discrimination where board member's "comments did not single out [plaintiff's] religious character and d[id] not appear on their face to reflect discriminatory intent"); *Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 265 (S.D.N.Y. 2002) (finding that racially neutral comments denigrating plaintiff's hair could not be reasonably understood as a reflection of discriminatory animus).  Day's assertion that "[t]here is no such thing as a religious exemption" may sound insensitive on its own, (Docket No. 85-16 at 9), but understood in the context of his concern that religious exemptions were invoked dishonestly, it does not reflect any discriminatory animus towards sincerely-held religious beliefs or religious practice.[45]  Even viewing this evidence in the light most favorable to Plaintiffs, any "hostility" in these statements is directed expressly at *non-religious* individuals who pretextually invoked religious exemptions to avoid complying with the law, putting the public health at risk. (*See* Docket No. 83 at 14). The Emergency Declaration is therefore neutral.

## 2.  General Applicability

"Inequality results when [the government] decides that the . . . interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542–43.  Therefore, the general applicability requirement prohibits the government

---

[45] The same is true even if a jury were to find that, consistent with Day's deposition testimony, Defendants issued the Declaration to avoid additional spikes caused by the predicted increase in travel and large indoor gatherings in light of the upcoming religious holidays. (*See* Pl. Counterstatement ¶ 128; Docket No. 79-5 at 5:7-6:20).  Such evidence does not support a conclusion that the Declaration was meant to target Plaintiffs' children *because of*, rather than in spite of, their religious beliefs. *See Lukumi*, 508 U.S. at 540; *Feeney*, 442 U.S. at 279.

from "in a selective manner impos[ing] burdens only on conduct motivated by religious belief." *See id.* at 543; *see also id.* at 557 (noting that "the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment") (Scalia, J., concurring in part).  A law is not generally applicable if it is "substantially underinclusive" in that it regulates religious conduct, but does not regulate secular conduct that is "at least as harmful to the legitimate government interests purportedly justifying it." *Cent. Rabbinical Cong.*, 763 F.3d at 197; *see also Blackhawk v. Pa.*, 381 F.3d 202, 209 (3d Cir. 2004) (holding that general applicability requirement is not met when a law "burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated"); *Ungar v. New York City Hous. Auth.*, No. 06 Civ. 1968, 2009 WL 125236, at *17 (S.D.N.Y. Jan. 14, 2009), *aff'd*, 363 F. App'x 53 (2d Cir. 2010) (same).  On the other hand, the general applicability requirement is satisfied when a law (1) "extend[s] well beyond isolated groups of religious adherents," and (2) does not exempt secular conduct that undermines the government's stated interest. *See Cent. Rabbinical Cong.*, 763 F.3d at 195, 197.

Applying this requirement, the Second Circuit recently found in *Roman Catholic Diocese* that in addition to being nonneutral, the subject order was not generally applicable because it favored "some" secular businesses, while restricting "'non-essential' activities and religious worship," without regard to the favored businesses' transmission risk. *See Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 632.  In other words, the order was "substantially underinclusive" because, although it limited the operations of religious institutions and even

secular businesses, it left unregulated too many other categories of secular conduct when there

was evidence that such conduct posed more safety concerns than the regulated conduct. *See id.*;

*Cent. Rabbinical Cong.*, 763 F.3d at 197.

Here, the Emergency Declaration is generally applicable because, first, it imposes

identical burdens on religious and non-religious conduct and certainly does not impose special

burdens on religion alone. *See Lukumi*, 508 U.S. at 543; *Agudath Israel* (*Roman Catholic*

*Diocese IV*), 983 F.3d at 632.  By its terms, the Declaration restricts numerous categories of

children besides those with religious affiliations, as it applies to children between six months and

eighteen years old who were unvaccinated for any reason besides being medically exempt from

vaccination or serologically immune to measles — regardless of whether the reason was secular

or religious. (Docket No. 79-13 at 3).  As Defendants argue, the Declaration covers

homeschooled children not subject to any schoolwide vaccination mandate, (Docket No. 81 at

34), as well as children who simply were not vaccinated for non-religious reasons, such as their

parent or guardian's distrust of vaccines or modern medicine, (*see* Docket No. 87 at 7).[46]  Given

the multiple categories of non-religious children affected by the Declaration to the same extent as

Plaintiffs' children, it simply is not the case that the Declaration is "*substantially*

*underinclusive*," *see Cent. Rabbinical Cong.*, 763 F.3d at 197 (emphasis added), or burdens

religious individuals "but almost no others," *see Lukumi*, 508 U.S. at 536, 543–44.  This is

consistent with numerous cases applying rational basis review where the subject laws imposed

the same restrictions on all secular and religious conduct deemed problematic. *See, e.g.*,

---

[46] Plaintiffs' observation that Day was unable to identify any specific individuals opposed to vaccination (*i.e.*, "anti-vaxxers") during his deposition does not alter the analysis. (Pl. Counterstatement ¶ 143).  Given the broad, religion-neutral scope of the Declaration, the mere fact that the County Executive, a high ranking official, did not have personal contact with any such individuals or remember their names is insufficient to raise a triable issue of fact regarding whether the Declaration operated in a discriminatory manner.

*Commack Self-Serv. Kosher Meats*, 680 F.3d at 210–11 (finding Kosher Act mandating food labeling requirements generally applicable as it "applie[d] to any seller who offer[ed] products for sale as 'kosher' regardless of the seller's religious belief or affiliation," to protect consumers who purchased kosher foods for religious or secular purposes); *CompassCare v. Cuomo*, 465 F. Supp. 3d 122, 154 (N.D.N.Y. 2020) (finding that statute was not underinclusive because it "applie[d] both to religious and non-religious employers on the same terms, and d[id] not include any requirements that work[ed] to include or exclude religious employers from coverage"); *Roman Catholic Diocese of Rockville Ctr.*, 128 F. Supp. 3d at 583 (finding zoning amendment generally applicable as its restrictions on religious conduct "[we]re similarly pursued in the Village Zoning Code's provision regulating analogous non-religious conduct").

Second, and more importantly, the Emergency Declaration is generally applicable because its single exception for medical exemptions served Defendants' interest in quelling the measles outbreak just as much as the rest of its provisions, *see Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 632; *Cent. Rabbinical Cong.*, 763 F.3d at 197, and was constitutionally *required* under longstanding precedent regarding mandatory vaccination laws, *see Jacobson*, 197 U.S. at 38–39; *Phillips*, 775 F.3d at 543.  Plaintiffs contend that the exception for medical exemptions renders it underinclusive because children who were unvaccinated for medical reasons were just as likely as children with religious exemptions to become infected and spread the virus. (Docket No. 83 at 18-19).  Although Plaintiffs raise a compelling argument, after much consideration, the Court is not persuaded.  This is because, as Defendants explain, the medical exemption was created to control the measles outbreak by encouraging vaccination of all those for whom it was medically possible, while protecting those who could not be inoculated for medical reasons. (*See* Docket Nos. 81 at 34; 79-5 at 43:15-17) (stating that children with medical

exemptions "were the ones [Defendants] were trying to protect by having everyone else immunized"); *see also Lukumi*, 508 U.S. at 542–46; *Cent. Rabbinical Cong.*, 763 F.3d at 197. Moreover, the Court must respect Defendants' expertise as officials specifically elected to protect the public health, and numerous courts have recognized the constitutional validity of mandatory vaccination laws.

In the seminal case *Jacobson v. Massachusetts*, the Supreme Court upheld a statewide mandatory vaccination law for smallpox over a citizen's objection that it invaded his bodily integrity, due to the broad police powers of government officials to protect the community "against an epidemic of disease which threatens the safety of its members." *See* 197 U.S. 11, 27 (1905). Such police powers, the Supreme Court reasoned, emanate from the fact that "[t]he mode or manner" of safeguarding public health and public safety "is within the discretion of the state" and any local authorities to which it delegates that task. *See id.* at 25; *see also Zucht v. King*, 260 U.S. 174, 176 (1922) (noting that *Jacobson* and other cases have "settled that a state may . . . delegate to a municipality authority to determine under what conditions health regulations shall become operative" and that "the municipality may vest in its officials broad discretion in matters affecting the application and enforcement of a health law"). The Supreme Court further instructed that the judiciary must not invalidate such a law enacted pursuant to such concerns unless it lacks a "real or substantial relation [to public health]" or "is, beyond all question, a plain, palpable invasion of rights[.]" *Jacobson*, 197 U.S. at 31. It warned, however, that this deference does not permit the State to "contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." *Id.* at 25. In addition, such deference must give way to protect individual rights in "extreme case[s]," to safeguard the health

and life of a person not "fit . . . [for] vaccination" or for whom "vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death." *Id.* at 38–39.

Over a century later, the Supreme Court in *Roman Catholic Diocese* reiterated this caveat, cautioning that although courts "should respect the judgment of those with special expertise and responsibility in [the public health] area[,] . . . even in a pandemic, the Constitution cannot be put away and forgotten." *See* 141 S. Ct. at 68; *see also S. Bay I*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring) (noting that "[w]here . . . [the State's] broad limits *are not exceeded*, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people") (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)) (emphasis added).  On remand, the Second Circuit further denounced any "special deference to the executive when the exercise of emergency powers infringes on constitutional rights," especially given that *Jacobson* was not a free exercise case and therefore cannot supplant traditional free exercise analysis. *Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 635. The Second Circuit acknowledged, however, that in applying this framework, "the uncertainties that accompany many novel emergencies may . . . call[] for a measure of humility on the part of the reviewing judge," and echoed the need for judicial respect for medical expertise. *Id.* at 635–36; *see also S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 716 (2021) (mem.) (hereinafter "*S. Bay II*") ("To state the obvious, judges do not know what scientists and public health experts do.") (Kagan, J., dissenting).

Understanding that courts cannot close their eyes to serious constitutional issues simply because a law is meant to respond to a public health emergency, *see Roman Catholic Diocese III*, 141 S. Ct. at 68; *Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 635–36, the Court

-54-

nevertheless finds that strict scrutiny is inappropriate here because the categories imposed by the Emergency Declaration *all* served the purpose of quelling the outbreak by encouraging county-wide vaccination, a measure permitted in a variety of constitutional contexts by *Jacobson* and its progeny. *See Lukumi*, 508 U.S. at 542–46; *Cent. Rabbinical Cong.*, 763 F.3d at 197.  For that reason, too, the complained-of restrictions are distinguishable from those in *Roman Catholic Diocese*, which had nothing to do with vaccination. *See Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 632.  Indeed, to the extent that Plaintiffs argue the Declaration was unconstitutional because it conditioned their children's rights to attend school on becoming vaccinated, (*see* Docket No. 83 at 15), that contention is foreclosed by well-established precedent holding that mandatory vaccination laws are consistent with the Constitution, *see, e.g.*, *Jacobson*, 197 U.S. at 37 (rejecting Fourteenth Amendment claim against mandatory vaccination law for smallpox for all adults over age twenty-one); *Prince v. Mass.*, 321 U.S. 158, 166–67 (1944) (noting that a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds" and "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"); *see also Zucht*, 260 U.S. at 176 (rejecting equal protection challenge to local law requiring children to be vaccinated in order to attend school).  This is because "a minority, residing or remaining in any city or town where [a communicable disease] is prevalent, and enjoying the general protection afforded by an organized local government," lacks the right to "defy" the expertise and good-faith efforts of that government to protect the community from disease via "a system" that medical advisers and the wider community agree is "vital to protect the safety of all." *Jacobson*, 197 U.S. at 37.

The Second Circuit in *Phillips v. City of New York* extended this reasoning and expressly held that "mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause." 775 F.3d 538, 543 (2d Cir. 2015).  The Circuit rejected the argument — almost identical to Plaintiffs' assertions here — that schools' temporary exclusion of children with religious exemptions during a chickenpox outbreak violated the Free Exercise Clause, because under *Jacobson*, a state could constitutionally "require that all children be vaccinated in order to attend public school." *Id*.  Therefore, New York's religious exemptions went "beyond what the Constitution requires," such that its "more limited exclusion" of unvaccinated religious children and any others who were not vaccinated "during an outbreak of a vaccine-preventable disease [wa]s clearly constitutional," even though it affected the plaintiffs' religious practice. *Id.* Numerous other courts outside of this Circuit have affirmed that *Jacobson* permits the State to mandate vaccination for school-aged children regardless of whether it violates their parents' religious beliefs.[47] *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (noting that religious plaintiff had no constitutional right to exemption from mandatory vaccination law for public school students, even though the state provided one); *Schenker v. Cty. of Tuscarawas*, No. 5:12 CV 1020, 2012 WL 4061223, at *12 (N.D. Ohio Sept. 14, 2012) (holding that juvenile court's order that children be vaccinated while in foster care did not violate First Amendment); *Boone v. Boozman*, 217 F. Supp. 2d 938, 954 (E.D. Ark. 2002) (finding that compulsory inoculation statute for school children with medical exemption but no religious exemption was

---

[47] Moreover, even when vaccines are mandated by an employer rather than the State, the few courts that have addressed this issue, albeit outside of the free exercise context, have looked favorably on such policies. *See Chmura v. Monongalia Health Sys.*, No. 1:17-CV-222, 2019 WL 3767469, at *8 (N.D.W. Va. Aug. 9, 2019) (finding that an employee was lawfully terminated for failing to comply with the employer's mandatory vaccination policy); *see also Am. Dental Ass'n v. Martin*, 984 F.2d 823, 839 (7th Cir. 1993) (Coffey, J., concurring in part) (noting the potential benefit of mandatory HBV vaccination for healthcare workers under Occupational Safety and Health Administration rule, and looking to mandatory vaccination programs for schoolchildren, those traveling abroad and those in the armed forces as examples).

constitutional).  Likewise, though not binding precedent, the Appellate Division, Second

Department came to the same conclusion regarding the April 2019 mandatory measles

vaccination order in Williamsburg, Brooklyn, finding that the order survived rational basis

review even though it provided a medical exemption, but not a religious one. *See C.F. v. New*

*York City Dep't of Health & Mental Hygiene*, No. 2019-04455, 2020 WL 7636501, at *2–3, 15

(2d Dep't Dec. 23, 2020) (hereinafter "*C.F. II*").

Similarly, here, Defendants' use of the Declaration to encourage widespread vaccination

of all children except those with medical exemptions, for a limited period of thirty days, was a

permissible exercise of Defendants' police power. *See Phillips*, 775 F.3d at 543; *Boone*, 217 F.

Supp. 2d at 954.  There is no dispute that in March 2019, the local government was struggling to

trace infections and save lives, an onerous task when measles cases fluctuated on a weekly basis

and those infected could unknowingly spread the virus before developing symptoms. *See S. Bay*,

140 S. Ct. at 1613–14 (Roberts, C.J., concurring); *C.F. II*, 2020 WL 7636501, at *1–2; (Docket

No. 79-3, Ex. D at 47).  The medical exemption did not undermine that purpose because under

*Jacobson*'s carve-out for persons "[un]fit" for vaccination, the State could *not* constitutionally

force children with documented medical reasons for being exempt from vaccination to

nonetheless put their health at risk in order to comply with the law. *See* 197 U.S. at 38–39

(noting that State's police power does not allow compulsory vaccination for those to whom

"vaccination in a particular condition of his health or body would be cruel and inhuman to the

last degree"); *Nikolao*, 875 F.3d at 316 (noting that under *Jacobson*, "compulsory vaccination

laws with only medical exemptions do not violate any federal constitutional right"); *Boone*, 217

F. Supp. 2d at 953 (upholding mandatory vaccination law for public school students except those

"for whom immunization would endanger their health").  Therefore, the Declaration was not

underinclusive simply because it provided an exemption for children whose lives would be threatened by inoculation. *See Jacobson*, 197 U.S. at 38–39. Rather, the medical exemption furthered Defendants' public health purpose by encouraging community-wide vaccination on the one hand, and protecting the lives and safety of those who could not be vaccinated, on the other. *See id.* For all of these reasons, the Declaration is not subject to strict scrutiny because, in addition to being neutral towards religion, it is not "substantially underinclusive." *See Cent. Rabbinical Cong.*, 763 F.3d at 197.

### 3.  Rational Basis Review

"When the government seeks to enforce a law that is neutral and generally applicable, 'it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices.'" *Commack Self-Serv. Kosher Meats*, 680 F.3d at 212 (quoting *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir. 2002)). Rational basis review "'requires merely that the action be rationally related to a legitimate government objective.'" *E. End Eruv Ass'n v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 539 (E.D.N.Y. 2011) (quoting *Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d Cir. 2009)). This is so "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996); *see also Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (a law does not fail rational basis review "simply because it may not succeed in bringing about the result it seeks to accomplish . . . , because the problem could have been better addressed in some other way, . . . because the statute's classifications lack razor-sharp precision . . . [or] [because] no empirical evidence supports the assumptions underlying the legislative choice"). The subject law "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the

classification." *A.M. ex rel. Messineo v. French*, 431 F. Supp. 3d 432, 447 (D. Vt. 2019) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

For several reasons, the Declaration is rationally related to Defendants' stated interest in controlling the measles outbreak. *See Phillips*, 775 F.3d at 543; (Docket Nos. 81 at 30; 87 at 7). Protecting the public from a communicable disease is undoubtedly a legitimate, if not compelling, governmental objective. *See Roman Catholic Diocese III*, 141 S. Ct. at 67. Moreover, there is a rational basis for the Declaration's restrictions. *See Phillips*, 775 F.3d at 543; *C.F. II*, 2020 WL 7636501, at *15. Data throughout the outbreak consistently demonstrated that unvaccinated children were most likely to get sick and face complications, a notion supported by scientific studies. (Defs. 56.1 ¶¶ 40, 43, 54, 55, 58; Pl. 56.1 ¶¶ 40, 43, 54, 55, 58; Docket Nos. 79-3 ¶ 4; 79-14 ¶ 7). Defendants have also provided medical evidence that during outbreaks, the measles virus has a high risk of transmission via large gatherings. (Docket No. 79-3, Ex. D at 44). Therefore, it was reasonable to impose gathering restrictions for a limited period of time on children who remained unvaccinated, even though such restrictions would affect their ability to attend religious services, and regardless of whether vaccination was against certain children's or parents' religious beliefs. *See Prince*, 321 U.S. at 166–67. This is especially so where the Declaration itself did not actually require anyone in the affected group to be vaccinated — it only required vaccination if they wished to gather publicly for the next thirty days. (Docket No. 79-13 at 3).

Plaintiffs' argument that Defendants' stated rationale for excepting medical exemptions "seems tenuous" does not alter the analysis, where the classifications are religion-neutral and supported by medical expertise. *See Romer*, 517 U.S. at 632. It is not the Court's place to discard this emergency measure meant to protect the community when there is sufficient medical

evidence in the record supporting the restrictions at issue. *Cf. Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 635–36; *see also Jacobson*, 197 U.S. at 37; *Phillips*, 775 F.3d at 543.

Accordingly, the Court finds that Defendants did not violate the Free Exercise Clause.

## 4. Strict Scrutiny

In the alternative, if strict scrutiny were to apply, the Court finds that the Declaration still survives Plaintiffs' free exercise challenge. Under this more stringent standard, "a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Fifth Ave. Presbyterian Church*, 293 F.3d at 574 (quoting *Lukumi*, 508 U.S. at 546). To meet the "narrowly tailored" requirement, courts ask whether the policy at issue was "the least restrictive means of achieving" the government's compelling interest. *Thomas,* 450 U.S. at 718; *see also Roman Catholic Diocese III*, 141 S. Ct. at 67. The government's justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Agudath Israel Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 633 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Moreover, the government must show that it "seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)). The Second Circuit in *Roman Catholic Diocese* noted, however, that in the context of a health crisis, due to "the uncertainties that accompany many novel emergencies," courts may need to exercise some degree of "humility" when assessing whether "a less restrictive alternative actually exists." *See id.* at 635.

Here, Defendants' interest in quelling the measles outbreak was undoubtedly compelling, *see Roman Catholic Diocese III*, 141 S. Ct. at 67, and the Declaration was narrowly tailored because it was the least restrictive measure available to reach that objective in light of Defendants' previous unsuccessful efforts, the medical data and their limited resources in March 2019, *see Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 633–34; *C.F. II*, 2020 WL

7636501, at *9–10, *15.  The Declaration was drafted to encourage vaccination of all children

who could be inoculated without endangering their health, or who did not need to be vaccinated

because they were deemed serologically immune. (Docket No. 79-13 at 3).  As explained,

Defendants imposed gathering restrictions only on unvaccinated children based on data

demonstrating that such children were most likely to catch and therefore spread the virus, (Defs.

56.1 ¶¶ 40, 43, 54, 55, 58; Pl. 56.1 ¶¶ 40, 43, 54, 55, 58; Docket Nos. 79-3 ¶ 4; 79-14 ¶ 7), and

that transmission risk is high at large events, (Docket No. 79-3, Ex. D at 44).

Furthermore, Plaintiffs' assertion that the Declaration is not narrowly tailored because

Defendants could have issued a mandatory quarantine instead, (*see* Docket No. 83 at 16-17), is

belied by the undisputed evidence that such a quarantine was not possible in March 2019 due to

staff shortages, *see supra* n.7, 36.  Dr. Ruppert testified that although she requested additional

staff in October 2018 when the outbreak began, the assistance she received was not sufficient to

support mandatory quarantine measures, which required use of contact tracing technology to

identify exposures and active monitoring of affected persons. (Docket Nos. 79-7 at 57:6-59:12;

79:8 at 1:3-18).  Although Plaintiffs seem to argue that a reasonable juror could conclude that Dr.

Ruppert's stated reasons for not implementing a mandatory quarantine are unsupported by the

evidence because she testified that she did not specifically discuss quarantining with Day before

issuance of the order, (*see* Docket Nos. 83 at 16-17; 79-7 at 36:25-37:10), that is insufficient to

create a material issue of fact as to whether a quarantine was possible in the first place.  Indeed,

nowhere do Plaintiffs dispute Dr. Ruppert's reasoning as to why her staff could not support that

measure alone, even after she gained a few team members in the beginning of the outbreak.

(Docket No. 79-7 at 57:6-59:12).  As Dr. Ruppert explained, the only reason a mandatory

quarantine was possible in April 2019 was that the CDC identified a staff shortage and sent forty

additional people to Defendants' office. (Docket No. 79-7 at 58:3-59:12).  However, the CDC is plainly a separate and distinct entity from the County and RCDOH, and therefore was not under any of Defendants' control. *See Day v. Warren*, No. 3:06CV155(AWT), 2006 WL 3259117, at *5 (D. Conn. Nov. 8, 2006).  To the extent Plaintiffs argue that Defendants should have somehow obtained the CDC's aid earlier in the outbreak, when there is no reasonable dispute that Dr. Ruppert did try to obtain more staff, *see supra* n.36, that contention fails to recognize Defendants' authority as elected representatives to use their best judgment to allocate their limited resources as they saw fit in the midst of the outbreak. *See Jacobson*, 197 U.S. at 25; *Agudath Israel Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 635–36.  Because a mandatory quarantine was not possible until the CDC arrived, the Declaration was the least restrictive means available to quell the outbreak at the time it was issued, and therefore, it survives strict scrutiny.

For the foregoing reasons, the Court finds as a matter of law that Defendants did not violate Plaintiffs' free exercise rights.  Accordingly, Plaintiffs' free exercise claim is dismissed.

## C.  Equal Protection

Plaintiffs allege that the Emergency Declaration violated the Equal Protection Clause of the Fourteenth Amendment by treating religious individuals differently from those "who posed the same alleged threat to public health," including (1) those not immunized for medical reasons, and (2) those not immunized because they were over the age of eighteen. (Docket No. 35 ¶ 86).

The Equal Protection Clause of the Fourteenth Amendment requires that no state "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  This command "direct[s] that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *see also Sound Aircraft Servs., Inc. v. Town of E. Hampton*, 192 F.3d 329, 335 (2d Cir. 1999) ("At its core, equal protection

prohibits the government from treating similarly situated persons differently.").  In other words, the government may not "subject[] individuals to 'selective treatment . . . based on impermissible considerations such as . . . religion.'" *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 235 (S.D.N.Y. 2005) (quoting *Knight v. Conn. Dep't of Public Health*, 275 F.3d 156, 166 (2d Cir. 2001)).

A plaintiff "challenging a facially neutral law on equal protection grounds bear[s] the initial burden of making out a prima facie case of discriminatory purpose." *Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) (quoting *Jana–Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006)).  A plaintiff may do so in a number of ways. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 407 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, N.Y.*, 945 F.3d 83 (2d Cir. 2019).  A plaintiff may "prove purposeful discrimination by a government actor, directed at a suspect class, such as a racial group, or a religion," and that the law has a discriminatory effect on that class. *See Pyke*, 567 F.3d at 78; *id.* (quoting *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 614 (S.D.N.Y. 2013), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, N.Y.*, 945 F.3d 83 (2d Cir. 2019)).  If the plaintiff makes such a showing, the government action at issue is "subject to strict judicial scrutiny," such that the law may be upheld only if it "further[s] a compelling state interest and [is] narrowly tailored to accomplish [that] purpose." *Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d at 407 (quoting *Pyke*, 567 F.3d at 77).  However, "[a]bsent evidence of intentional discrimination, the government action is subject to rational basis review." *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 936 F. Supp. 2d 321, 338

(S.D.N.Y. 2013), *aff'd sub nom. Am. Atheists, Inc. v. Port Auth. of New York & New Jersey*, 760

F.3d 227 (2d Cir. 2014).

Rational basis review is also appropriate where the classification at issue does not

implicate a suspect class. *See Vance v. Bradley*, 440 U.S. 93, 96–97 (1979).  For example, the

rational basis review test applies to age-based distinctions because age is not a suspect class. *See*

*id.*; *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000).  For any claim analyzed under

rational basis review, the subject law will not be overturned "unless the varying treatment of

different groups or persons is so unrelated to the achievement of any combination of legitimate

purposes that [the Court] can only conclude that the [government]'s actions were irrational."

*Vance*, 440 U.S. at 97.  In other words, the classification at issue does not offend equal protection

if it is "rationally related to a legitimate state interest." *Kimel*, 528 U.S. at 83.

Because Plaintiffs challenge the Declaration for differential treatment of their children

with regard to both their religious beliefs and age, the Court addresses each of these allegations

separately.

### 1. Religious Beliefs

Plaintiffs allege intentional discrimination based on their religion, and therefore, that they

belong to a suspect class.  However, "where a law subject to an equal protection challenge 'does

not violate [a plaintiff's] right of free exercise of religion,' courts do not 'apply to the challenged

classification a standard of scrutiny stricter than the traditional rational-basis test.'" *A.M. ex rel.*

*Messineo*, 431 F. Supp. 3d at 447 (quoting *Johnson v. Robison*, 415 U.S. 361, 375 n.14

(1974)).  Since Plaintiffs' free exercise claim survives rational basis review or strict scrutiny, the

Court must apply the same standard to their equal protection claim. *See id.*  The Court must also

continue to remain cognizant of the public health considerations discussed in *Jacobson* and

*Roman Catholic Diocese*, which numerous courts have understood as applicable to all

constitutional claims beyond free exercise challenges in the context of a health crisis. *See, e.g.*, *Clementine Co. LLC v. Cuomo*, No. 20 Civ. 8899 (CM), 2020 WL 7321504, at *2 (S.D.N.Y. Dec. 11, 2020); *Bimber's Delwood, Inc. v. James*, 20-CV-1043S, 2020 WL 6158612, at *7 (W.D.N.Y. Oct. 21, 2020); *McCarthy v. Cuomo*, 20-cv-2124 (ARR), 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020).

Applying these considerations, for the reasons stated *supra* in Section III.B.3., the Declaration is rationally related to its public health purpose, even though it treated children with religious exemptions differently from vaccinated children and children with medical exemptions. *See Zucht*, 260 U.S. at 176–77 (upholding compulsory vaccination law for school children under equal protection challenge because "in the exercise of the police power reasonable classification may be freely applied, and that regulation is not violative of the equal protection clause merely because it is not all-embracing"); *Tatta v. Wright*, 616 F. Supp. 2d 308, 319 (N.D.N.Y. 2007) (granting summary judgment on equal protection claim where there was "no evidence" that "different treatment of [plaintiff] was motivated by anything other than . . . medical fact"). Although Plaintiffs contest the rationale behind the medical exemption, as explained above, that rationale is permissible under the Constitution, *see Jacobson*, 197 U.S. at 37, and the rational basis standard leaves room for the government's "generalization[s] . . . when there is an imperfect fit between means and ends," *Heller v. Doe*, 509 U.S. 312, 321 (1993); *Zucht*, 260 U.S. at 176–77.  Given that the Declaration survives strict scrutiny, it clearly passes the more forgiving rational basis test. *See Zucht*, 260 U.S. at 176–77.

## 2.  Age

Plaintiffs allege that the Declaration also violated the Equal Protection Clause because it applied solely to unvaccinated children between six months old and eighteen years old, but failed to restrict unvaccinated adults who could equally spread the virus. (Docket No. 35 ¶ 86).

Defendants counter that applying the Declaration to unvaccinated adults would be harmful to the community because those adults would be unable to work, make a living, and care for their families. (Docket No. 81 at 34).  Defendants further maintain that the Declaration was crafted to balance this concern with the need to target those most at risk for catching the virus. (*See id.* at 33-34).

This stated goal of containing the measles outbreak, while allowing adults to work and care for their families, is a legitimate government objective.  Numerous courts have recognized that the government may draw age-based distinctions in the interest of protecting or promoting the wellbeing of a particular age group without violating the Equal Protection Clause. *See, e.g.*, *City of Dallas v. Stanglin*, 490 U.S. 19, 22–23 (1989) (holding that ordinance restricting use of dance halls for persons between age fourteen and eighteen was rationally related to city's "legitimate interest in ensuring the safety and welfare of children"); *Presnick v. Berger*, 837 F. Supp. 475, 478 (D. Conn. 1993) (finding that encouraging the "health, well-being, and happiness of . . . seniors [wa]s a legitimate governmental objective").

In addition, there is a rational connection between Defendants' objective and the age distinction in the Declaration. *See Vance*, 440 U.S. at 96–97.  The government has "*substantial* latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe,* 457 U.S. 202, 216 (1982) (emphasis added).  Moreover, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Id.* (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).  Again, real-time data and science consistently demonstrated that unvaccinated children under the age of twenty were most

likely to get sick. (Defs. 56.1 ¶¶ 40, 43, 54, 55, 58; Pl. 56.1 ¶¶ 40, 43, 54, 55, 58; Docket Nos.

79-14 ¶ 7; 79-3 ¶ 4).  Consequently, it was reasonable to limit the movements of unvaccinated

children under the age of eighteen, which served the dual purpose of protecting the majority of

those susceptible to the disease while permitting adults to tend to their families' needs. *See*

*Vance*, 440 U.S. at 109 (finding that law requiring foreign services officers to retire at age sixty

"d[id] not offend the Constitution simply because the classification '[wa]s not made with

mathematical nicety . . .'") (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)); *Presnick*,

837 F. Supp. at 478.  Although this classification left out some unvaccinated adults susceptible to

the disease, it "at . . . least 'roughly approximate[d] the nature of the problem perceived.'" *See*

*Manbeck v. Katonah-Lewisboro Sch. Dist.*, 403 F. Supp. 2d 281, 287 (S.D.N.Y. 2005) (quoting

*Plyler*, 457 U.S. at 216).  Moreover, if the Declaration had included unvaccinated adults, it

would have undoubtedly created additional burdens on families whose children were covered by

the directive as well as by the Exclusion Orders, and therefore already faced significant

challenges balancing childcare with their other obligations. (*See* Docket No. 81 at 34).

　　　　For all of these reasons, the Court concludes that the Declaration's distinctions are not

irrational.  Accordingly, Plaintiffs' equal protection claim is dismissed.

**D.  Freedom of Assembly**

　　　　Plaintiffs' final claim is that the Declaration violated their children's First Amendment

rights to assemble publicly without a legitimate purpose because there was no "immediate threat

to public safety, peace or order" at the time it was issued. (Docket Nos. 35 ¶ 88; 83 at 21-22).

　　　　In addition to religious exercise, the First Amendment protects the "right of the people

peaceably to assemble." U.S. Const. Amend. I.  This includes the right to assemble publicly for

the purpose of engaging in religious exercise and expressive association. *See Sanitation &*

*Recycling Indus. v. City of New York*, 107 F.3d 985, 996–97 (2d Cir.1997); *Bikur Cholim, Inc. v.*

*Vill. of Suffern*, 664 F. Supp. 2d 267, 277 (S.D.N.Y. 2009).  However, like the right to exercise

religion, the right to assemble publicly is "not absolute." *See Jones v. Parmley*, 465 F.3d 46, 56

(2d Cir. 2006).  Indeed, "government officials may stop or disperse public demonstrations or

protests where 'clear and present danger of riot, disorder, interference with traffic upon the

public streets, or other immediate threat to public safety, peace, or order, appears.'" *Id.* at 56–57

(quoting *Cantwell*, 310 U.S. at 308).

In evaluating First Amendment claims for speech or public assembly, courts distinguish

between content-based and content-neutral regulations. *Murphy v. Lamont*, No. 3:20-CV-0694

(JCH), 2020 WL 4435167, at *12 (D. Conn. Aug. 3, 2020); *see also Johnson v. Perry*, 859 F.3d

156, 171 (2d Cir. 2017) ("[T]he same analytical framework applies whether the First

Amendment right being exercised is speech . . . or other 'expressive activity' such as assembly.")

(quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991)).  Whereas

content-based restrictions regulate speech "because of the topic discussed or the idea or

messaged expressed," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), content-neutral

restrictions "serve[] purposes unrelated to the content of expression . . . even if [they] ha[ve] an

incidental effect on some speakers or messages but not others," *Ward v. Rock Against Racism*,

491 U.S. 781, 791 (1989).  Content-based restrictions are evaluated under strict scrutiny. *See*

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992).  On the other hand, content-neutral

restrictions are subject to intermediate scrutiny, which requires that they be "reasonable, . . .

narrowly tailored to serve a significant governmental interest, and that they leave open ample

alternative channels for communication." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.

288, 293 (1984).  Unlike strict scrutiny, the narrow tailoring requirement under this standard

does not mandate that the subject action be the least restrictive means available to meet the

government's interest. *See Ward*, 491 U.S. at 798–99.  Rather, it is satisfied "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* at 800.

A state "may permissibly restrict [First Amendment] activity in the name of public health," as long as it does not treat religious activity differently from secular activity imposing similar risks. *See Lebanon Valley Auto Racing Corp. v. Cuomo*, 1:20-CV-0804 (LEK/TWD), 2020 WL 4596921, at *5 (N.D.N.Y. Aug. 11, 2020) (quoting *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1044 n.40 (D.N.M. 2020)) (internal quotations omitted).  Furthermore, provided that constitutional rights are not infringed, *Jacobson* requires courts to avoid "insert[ing] [them]sel[ves] in the ongoing nationwide dispute regarding the proper balance to be struck between regulating for the public welfare on one hand and free enterprise on the other." *Id.*; *see also Agudath Israel* (*Roman Catholic Diocese IV*), 983 F.3d at 635–36.

Here, the Declaration is content-neutral because it restricts the manner of assembly by gathering size, regardless of whether the purpose of gathering is secular or religious. *See Amato v. Elicker*, 460 F. Supp. 3d 202, 221–23 (D. Conn. 2020) (under traditional First Amendment analysis, finding that statewide gathering restrictions imposed in the face of COVID-19 pandemic were content-neutral because they limited recreational gatherings by size without regard to the type of gathering); (Docket No. 79-13 at 3).  The Declaration further prohibits unvaccinated children affected by the order from "enter[ing] *any* place of public assembly in Rockland County," with "place of public assembly" defined not only as a "place where more than 10 persons are intended to congregate" for "religious functions," but any such "place" other than a private residence used for a host of secular activities, such as "recreation or shopping," "food or drink consumption," "public transportation," "daycare or education[]," "medical

treatment," or "civic, governmental, or social" functions. (Docket No. 79-13 at 3) (emphasis

added).  Moreover, as explained above, Plaintiffs have not raised a triable issue of fact regarding

whether Defendants issued the Declaration for a content-specific purpose, *i.e.*, to control

religious gatherings simply because they were religious. *See Owen v. City of Buffalo, New York*,

465 F. Supp. 3d 267, 273–74 (W.D.N.Y. 2020) (on summary judgment, rejecting First

Amendment claim regarding content-neutral restrictions on speech where religious plaintiff

offered no evidence that "others with different messages" were permitted to take part in First

Amendment activity when he was not); *Lederman v. New York City Dep't of Parks &*

*Recreation*, 901 F. Supp. 2d 464, 475 (S.D.N.Y. 2012), *aff'd*, 731 F.3d 199 (2d Cir. 2013)

(granting summary judgment on First Amendment claim based on content-neutral restrictions on

"expressive matter" sales, absent evidence that their purpose was to "drive visual artists out of

the parks"); *see also Feeney*, 442 U.S. at 279.

Applying intermediate scrutiny, the Declaration clearly supports a significant government

interest in quelling the outbreak and is narrowly tailored. *See Amato*, 460 F. Supp. 3d at 221–23.

Although it prevented unvaccinated children from attending religious gatherings of ten or more

persons, it was temporary[48] and did not cancel religious gatherings altogether. *See id.* at 222.

Moreover, contrary to Plaintiffs' assertions, data showed that unvaccinated children were most

likely to spread and face complications from the measles, (Defs. 56.1 ¶¶ 40, 43, 54, 55, 58; Pl.

56.1 ¶¶ 40, 43, 54, 55, 58; Docket Nos. 79-14 ¶ 7; 79-3 ¶ 4), and that during outbreaks, it has a

high risk of transmission via large gatherings including religious events, (Docket No. 79-3, Ex. D

at 44).  Therefore, the Declaration was narrowly tailored to curtail the highest-risk situations. *Cf.*

*Ledermen*, 901 F. Supp. 2d at 477 (finding that restrictions were narrowly tailored where "record

---

[48] Although the Declaration was rescinded by the Supreme Court, County of Rockland, after less than two weeks,
*W.D.*, 63 Misc.3d at 936–37, it was originally intended to last for thirty days. (Docket No. 79-13 at 3).

reflect[ed] that Defendants attempted only to impose spot designations on the most heavily used areas").  Absent the ability to impose universal vaccination or a mandatory quarantine, which Dr. Ruppert testified was impossible in March 2019, (Docket No. 79-7 at 57:18-58:11), there is sufficient evidence to establish as a matter of law that the Declaration was an appropriate solution. *See Ledermen*, 901 F. Supp. 2d at 477; *see also Ward*, 491 U.S. at 798–99.

Finally, for the children it affected, the Declaration left open ample alternative channels for communication. *See Ward*, 491 U.S. at 791.  The gathering size limitations still permitted such children to "communicate and express themselves in any means other than a large, in-person gathering" in a public place. *See Amato*, 460 F. Supp. 3d at 222.  For example, such children could assemble publicly for any purpose in small groups, were free to attend gatherings of any size in private residences, and could communicate with any number of people via electronic or telephonic means. *See id.*; (Docket No. 79-13 at 3).  Therefore, any religious children affected by the order could attend religious services remotely, pray in houses of worship in small groups, and participate in the upcoming religious holidays without restrictions at private homes. (Docket No. 79-13 at 3).  The Declaration also made reasonable exceptions for children to assemble publicly if required by law or to receive medical treatment. (Docket No. 79-13 at 3-4).  In short, given Defendants' limited options, and the latitude afforded to the government's judgment during medical crises, the Court cannot conclude that the Declaration was "substantially broader than necessary" to curtail the outbreak. *See Ward*, 491 U.S. at 800.  Accordingly, Plaintiff's freedom of assembly claim is dismissed.

**E.  Damages**

Because the Court grants Defendants' summary judgment motion on the grounds explained herein, the Court declines to address Defendants' damages argument.

**IV.  CONCLUSION**

For the foregoing reasons, Defendants' motion is granted in its entirety.  The Clerk is

respectfully requested to terminate the pending motion, Docket No. 78, and close the case.

Dated:    February 22, 2021
          White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge

-72-